Chew, Appellant, *v.* Commonwealth.

Argued April 25, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and EAGEN, JJ.

reargument refused June 30, 1960.

*Frederick H. Spotts,* with him *John B. H. Donald-son, Thomson F. Edwards,* and *Lippincott & Donaldson,* and *Pepper, Hamilton & Sheetz,* for appellants.

*Frank E. Roda,* with him *John R. Rezzolla,* and *Anne X. Alpern,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 3, 1960:

On July 8, 1905, the Philadelphia Western Railway Company condemned for railroad purposes in Delaware and Chester Counties a strip of land 5487.2 feet long and 90 to 150 feet wide, comprising 14.27 acres. The board of viewers awarded damages to the owners of the land, Mary J. B. Chew and Martha Brown, in the sum of $73,221.33. By virtue of these proceedings the railroad company acquired a fee simple defeasible in the land, that is, a title subject to defeat in the event the railroad company abandoned the land as a railroad right of way. By the same token, the landowners acquired, or retained, a possibility of reverter which would ripen into a renewed fee simple ownership if and when the defeasible title in the company terminated.

The Philadelphia Western Railway Company and its successor by merger, the Philadelphia Suburban Transportation Company, operated trains over the land (this being its Strafford-Villanova Branch) without any evident change of policy until April 4, 1955, when the present company, through its directors, adopted the following Resolution: "RESOLVED, That the officers of this Company are hereby authorized to make proper

application and do all things necessary to *substitute bus service for Strafford Rail* Division service between Villanova Junction and the Strafford Terminus. . ." (Emphasis supplied)

Acting on this resolution, the officers of the Philadelphia Suburban Transporation Company applied, in June, 1955, to the Public Utility Commission "for approval of the *abandonment of street railway service and facilities* on that portion of its 69th Street Terminal-Strafford line beginning at the Villanova Junction switch points . . . and extending northwestwardly on private right of way, a distance of approximately 3.74 miles to its westerly terminus at Strafford . . ." (Emphasis supplied)

On September 7 and September 22, 1955, the Public Utility Commission held hearings on this application but before it could render its decision, the Commonwealth of Pennsylvania condemned the property for *highway purposes.* On February 6, 1956, the commission approved the application of the railroad company, and, in consequence of the commission's order in the matter, the railroad ran its last train on March 22, 1956.

Had it not been for the condemnation by the Commonwealth of the land on November 25, 1955, the title to the controverted property would, on March 22, 1956, by operation of the law of reverter, have vested in the plaintiffs here, successors of Mary J. B. Chew and Martha Brown, the original landowners. After the condemnation, the Commonwealth paid to the railroad company for a tract of land, which embraced the property in question, the sum of $125,000.

On January 12, 1959, the board of viewers chosen to ascertain damages resulting from the Commonwealth's condemnation, fixed the damages at $45,000, but failed to name a recipient of the award because it could not determine who was entitled to it and in what

proportions. The plaintiffs claim ownership of the award because, under their acquired rights of reverter, they have title to the land.

The Restatement of the Law of Property, section 53 comment c, provides: "c. *Distribution of award— Occurrence of stated event imminent.* If viewed from the time of the commencement of an eminent domain proceeding, and not taking into account any changes in the use of the land sought to be condemned which may result as a consequence of such proceeding, the event upon which a possessory estate in fee simple defeasible is to end is an event *the occurrence of which, within a reasonably short period of time, is probable,* then the amount of damages is ascertained as though the estate were a possessory estate in fee simple absolute, and the damages so ascertained are divided between the owners of the estate in fee simple defeasible and the owner of the future interest in such shares as fairly represent the proportionate value of the present defeasible possessory estate and of the future interest. It is immaterial whether the event upon which the possessory estate in fee simple defeasible is to end is related to the use of the land in question or is unrelated thereto. . ." (Emphasis supplied)

In the process of interpreting this section, the court below labored under the impression that, for the plaintiffs to be entitled to damages in accordance with this section, the abandonment of the railroad right of way had to take place, or was *certain* to take place, within a short time after the condemnation. We must repeat, however, that the Restatement says: "the event upon which a possessory estate in fee simple defeasible is to end is an event the occurrence of which, within a reasonably short period of time, is *probable.*" (Emphasis supplied.)

The court's error in reasoning reveals itself in the following excerpt from its opinions: "Clearly, the rail-

road had not abandoned its right of way at time of the condemnation proceedings. We toyed with the proposition that the abandonment might relate back to the date of the resolution of the Board of Directors after action by the Public Utility Commission and cessation of electric railway service, but we cannot logically or legally sustain such a position.

"When we view the position of the railroad company from the time of the commencement of the eminent domain proceeding, we cannot say as a matter of fact that the possessory estate in fee simple defeasible was going to end within a reasonably short period of time. Therefore, as a matter of law, we conclude that the reversionary interest had no ascertainable value at that date."

This line of argument presupposes, as already stated, that the actual abandonment had to take place at the time of the condemnation or with certainty soon thereafter. The court failed to take into account the element of *probability* that the abandonment would occur within a reasonably short time after the condemnation.

The Commonwealth followed the same inconstant star of interpretation when it said in its brief: "The pivotal question in this proceeding is whether or not the fee simple conditional title owned by the railroad company became divested prior to the date of the condemnation by the Department of Highways, thereby vesting in the plaintiffs a fee simple absolute title in the land originally condemned for railroad purposes. . . . If it can be determined by their action that the railroad company had abandoned the right of way in question prior to November 25, 1955, then the question raised on this appeal is an easy one to solve. On the other hand, if the railroad did not, by its action, abandon its right of way prior to the date of condemnation then the appeal of the plaintiffs from the decision of the court below must necessarily fail."

The Commonwealth here relied on cases dealing with tests involving actual abandonment and on cases decided prior to the Restatement rule which the Commonwealth concedes to be applicable. The *probability* of an imminent abandonment was completely overlooked by both the Commonwealth and the trial court.

The question to be decided on appeal, is, as stated by the Commonwealth in its brief: "On the date of condemnation, was the abandonment by the railroad company of its right of way so imminent as to make the plaintiffs' right of reverter a valuable property right for which they would be entitled to compensation from the condemning body?"

The court below answered this question in the negative. We are of the opinion that the abandonment by the railroad of its right of way was, indeed, imminent and probable at the time of condemnation and that, therefore, the court below erred in not so holding.

Before the Commonwealth condemned the property the railroad company had already decided to apply to the Public Utility Commission for authorization to abandon the rail service between Villanova Junction and Strafford Terminus, and substitute bus service in its place. Since the resolution adopted by the railroad company specifically declared the bus service was to take the place of the rail service, and the latter was to be abandoned, it could only naturally follow that the rail service was to cease completely.

The Commonwealth argues that, even under this state of affairs, the railroad company could, if it so desired, still run trains during peak hours and that it could continue doing so until it acquired enough capital to purchase and operate buses. Thus, the abandonment of the right of way was not imminent or probable at the time of the Commonwealth's condemnation.

But this argument must break on the rocks of the company's application which, in granitic and unequivo-

cal language, proclaimed that the bus service was to be *substituted* for the railroad service and that the rail service over the involved right of way was to be *abandoned*. The railroad was not asking to be allowed to run buses in addition to trains.

The application to the Public Utility Commission was filed in June, 1955, five months prior to the condemnation proceedings. Then in September, 1955, only two months before the condemnation, the Public Utility Commission conducted hearings at which the Commonwealth appeared and presented as a witness its engineer Paul L. Thomas who testified that the Highway Department "has no objection to the applications . . . for *abandonment of service* and removal of structures over state routes with the stipulation that no cost is to be borne by the State . . ." (Emphasis supplied). How, in the face of these facts, can there be any doubt that at the time of the condemnation imminent abandonment of the railroad right was probable?

The commission approved abandonment of the rail service on February 6, 1956. Within a matter of six weeks the company ran its last train and instituted bus service. The court below was apparently not impressed with these verities and wiped them out of its consideration with the statement: "Hindsight would lead to the conclusion that abandonment was indeed imminent at the date of condemnation. If however, we consider the railroad's position at the time of its application for the abandonment of service, mere granting of its application did not necessarily mean immediate substitution of buses." But what more convincing evidence could there be of the imminence of an event? The most authoritative party involved does all that is possible to have it happen, there is no opposition to having the event occur, and then, in fulfillment of every anticipation, it occurs! And all in a matter of a few short weeks. When, on a hot sum-

mer's day, the sky darkens, the wind rises, the temperature falls and premonitory lightning flashes appear in the sky, it would indeed have to be an optimist not of this world to say that a rain storm was not probable or imminent. And then when the rain actually falls, it would have to be a hopeless non-realist to say that there had been no probability of an imminent storm when the elements had so eloquently and forcibly spoken their intentions. Thus, it is not a question of hindsight in verifying what has now irrevocably been written in the book of fulfillment. It is a question of taking oneself back to the eve of November 24, 1955, and determining whether or not, on that day, abandonment of the railroad service was not probable and imminent. We find that the events preceding that day clearly demonstrate, by the law of cause and effect, that this case facilely falls within the frame of the rule announced in the Restatement and quoted herein. Therefore, it follows legally, logically, and justly that the plaintiffs are indeed entitled to share in the award made by the board of viewers.

But one other observation needs to be made. The Commonwealth has presented the strange argument that the plaintiffs should be satisfied without monetary compensation because in some misty, vague, visionary manner they would benefit from having a highway traverse their land instead of a railroad. The Commonwealth's brief puts the rhetorical question: "Can the operation of a highway be considered more dangerous or more disturbing than the operation of a railroad?" But what is the relevancy of such a question? What possible gain can the plaintiffs derive from the fact that automobiles instead of trains or buses raise dust on the land, which, by operation of law, has become theirs? If the Commonwealth had not condemned the land, the plaintiffs would have acquired a fee simple title to the land on March 22, 1956,

when the railroad ceased all use of the right of way. By condemning the property the Commonwealth has deprived the plaintiffs of their reversionary interest but it cannot deprive them of the compensation to which they are entitled under Section 53, comment c of the Restatement, Law of Property.

The judgment of the court below is reversed and the record remanded for the ascertainment of a proper distribution among the plaintiffs of the damages awarded, the Commonwealth being entitled by subrogation to whatever would be distributable to the railroad company.