576 A.2d 358

**QUARRY OFFICE PARK ASSOCIATES, and Reality Engineering Company Appellees,**

v.

**PHILADELPHIA ELECTRIC COMPANY Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 9, 1990.

Filed May 8, 1990.

Reargument Denied July 10, 1990.

James C. Sargent, Jr., West Chester, for appellant.

Anthony J. Vetrano, Paoli, for appellees.

Before DEL SOLE, MONTEMURO and TAMILIA, JJ.

MONTEMURO, Judge:

This case involves a dispute over appellant Philadelphia Electric Company's (PECO) interest in a railroad line which traverses tracts of land owned by appellees Quarry Office Park Associates and Realty Engineering Company (Developers).

On December 19, 1986, Developer Quarry filed an action to quiet title, seeking to lay claim to land underlying the rail line on the basis that the Consolidated Rail Corporation (Conrail), PECO's predecessor in interest, had abandoned the railroad. On February 25, 1988, Developer Realty filed a complaint in ejectment, alleging abandonment by Conrail

and requesting that PECO remove the rails, ties, ballast and other railroad materials situated on the property. The trial court consolidated the two actions. In ruling in favor of Developers on the parties' cross-motions for summary judgment, the trial court found that Conrail held a conditional fee interest in the property, rather than a fee simple absolute, and that Conrail abandoned the rail line when Conrail conveyed the property to PECO, a "non-railroad." *See* Trial Court Opinion 2–3. The court found that Conrail had not successfully transferred its railroad right-of-way and thus Conrail's interest reverted to the original grantors and their successors in interest, i.e., Developers as the present owners of the parcels. PECO appeals from the order granting summary judgment in favor of Developers. Because we find that issues of triable fact exist, we reverse and remand the case for trial.

The rail line was established in 1851 and 1852, when Developers' predecessors in interest conveyed to the Chester Valley Railroad Company a portion of their land for use as a railroad. The Chester Valley Rail Road Company constructed a railroad, known as the Chester Valley Secondary, over these parcels of land; the rail line extends for approximately seven miles, from Tredyffrin Township in Chester County on the western end to King of Prussia, Montgomery County on the eastern end. Chester Valley's interest in the railroad eventually passed to the Reading Company, and from the Reading Company to Conrail in 1976. Conrail used the line for the transport of freight by its commercial customers. Since 1982, Conrail has used the rail line solely to move transformers to PECO's Upper Merion substation. As of the Spring of 1982, Conrail stopped servicing its other customers along the line. When the line ceased to generate sufficient revenues to continue operation and maintenance, Conrail filed two applications before the Interstate Commerce Commission (ICC), pursuant to Section 308(c) of the Regional Rail Reorganization Act of 1973 (RRR Act), 45 U.S.C. § 701 *et seq,* as amended by Section 1156 of the Northeast Rail Service Act of 1981,

requesting permission to abandon service to customers on the line. In July, 1984, the ICC authorized Conrail to abandon the line, if Conrail so chose. The ICC certificate authorizing Conrail's abandonment of the line stated that "[i]f the authority granted by this certificate and decision is exercised, Conrail shall advise this Commiss in writing, immediately after abandonment of the line of railroad, of the date on which the abandonment actually took place." R.R. 1171a. Conrail never provided written notice of a date of abandonment to the ICC. Conrail did not apply to the Pennsylvania Public Utilities Commission (PUC) for permission to abandon or abolish the bridges and highway crossings.

On May 2, 1986, Conrail conveyed its interest in the rail line to PECO for $600,000. PECO intends to use the line for routine or emergency replacement or upgrading of its transformers located at its Upper Merion Substation.[1] PECO anticipates that the substation will continue to expand due to the rapid residential and commercial development in the area and the increased electrical needs of PECO's customers. The substation is surrounded on all sides by natural and man-made impediments which restrict access by other means of transportation. The transport of the transformers over the rail line will be conducted by Conrail, pursuant to an agreement between PECO and Conrail.

Developers own adjacent pieces of property over which the rail line traverses. Developers Quarry and Realty, aware of the existence of the rail line, purchased the property in 1985 and 1984 respectively, intending to build multi-story office buildings or corporate headquarters on the land.

In reviewing an order granting summary judgment, our function is to determine whether any genuine issues of triable fact exist. *Melendez v. Pennsylvania Assigned*

---

1. The Upper Merion Substation is the most heavily loaded distribution substation in PECO's system, serving seven surrounding townships and several major industrial and commercial customers.

*Claims Plan,* 384 Pa.Super. 48, 557 A.2d 767, 768 (1989); *Alberici v. Tinari,* 374 Pa.Super. 20, 542 A.2d 127, 128 (1988). Summary judgment will be upheld if the pleadings, depositions, answers to interrogatories, admissions and affidavits indicate there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035(b); *Melendez, supra,* 384 Pa.Super. at 50, 557 A.2d at 768; *Alberici v. Tinari, supra,* 374 Pa.Super. at 22, 542 A.2d at 127.

The disposition of this case rests upon two determinations: the nature of interest in land the Chester Valley Rail Road Company acquired from Developers' predecessors in interest, and thus what interest Conrail acquired in the property; and whether Conrail abandoned its rights in the property before, or when, Conrail conveyed the rail line to PECO.

Developers predecessors in title are three landowners who, in 1851 and 1852, conveyed to the Chester Valley Railroad Company interests in that portion of the property underlying the rail line. The instruments of conveyance provide:

Know all Men by these Presents, That I, [name of landowner] of Chester County, for and in consideration of the benefits which may or shall result to me from the construction and completion of the Chester Valley Rail Road, and in consideration of the sum of One Dollar, to me in hand paid by the Chester Valley Rail Road Company, the receipt whereof is hereby acknowledged, have granted, bargained, sold, conveyed and confirmed, and by these presents do grant, bargain, sell, convey and confirm unto the said the Chester Valley Rail Road Company, their successors and assigns, the right, liberty, and privilege of entering upon and occupying the land belonging to me on and near the route of said Rail Road, (as the same is prescribed and defined in an Act of the General Assembly of the Commonwealth of Pennsylvania, passed on the 22d day of April, A.D., 1850 creating the said Company,) to the extent of thirty three (33) feet in width of the said

land on each side of the centre line of said Rail Road, and such additional width as may be necessary in the construction and use of said road at deep cuttings and embankments, but to no other or greater extent in width; and extending in length of the width aforesaid, [description of length] and also the right of using, occupying, and enjoying the said land perpetually, for all the uses and purposes convenient or necessary for a Rail Road. And I do hereby release to the said The Chester Valley Rail Road Company, all claim for or right to any damages which have accrued, or may or can accrue to me and to my heirs, executors, administrators and assigns, for or by reason of the said Company's taking, holding, or using the said land, to the extent herein above described, or any part thereof, for the use and purpose aforesaid.

R.R. 1091a, 1093a, 1095a.

In addition to the above language set forth on the Company's printed form, each of the instruments of conveyance contains a handwritten provision. The agreement between landowner W. Davis and Chester Valley contains handwriting to the effect that "[i]t is understood that I am to receive for the above grant two hundred & twenty five dollars $225 in cash and one share of the preferred stock in the Company—It is also understood that I am to do the fencing on both sides of the Rail Road the compensation for which is to be included in the above mentioned $225 & one share of stock, that being in full for damage & fencing. I also agree that in case the Courts shall at anytime decide that this damage belongs to other parties, then & in that case I will refund the Same." R.R. 1093a. The back of the document contains handwriting indicating receipt of $225.00 and $40.00 in lieu of one share of preferred stock as payment in full for the fence and for land damage done or likely to be done due to the construction of the railroad.

The agreement between landowner David Havard and the Company provides, in handwriting, that the "[i]t is understood that said Rail Road Company shall pay me for the Land occupied by said Company and a fence to be construct-

ed by me in a good and workmanlike manner on either side of said Road, and the cost attending the removal of my Barn along the line of said Road, the Sum of Five Hundred Dollars which Sum is to be paid by Sd. Company before commencing work on my property." R.R. 1095a. The back of the Havard instrument of conveyance notes receipt of $500.00 as payment for the fence, removal of the barn and damage done to the property by construction of the railroad.

The agreement between A.K. Davis and the Company provides, in handwriting, that "[i]t is understood that I am to receive for the above grant, at the rate of one hundred dollars per acre for the land occupied by the Rail Road —[ ]—It is understood that a Rail Road Bridge is to be constructed in the meadow opposite my house, instead of an Embankment—The land under said Bridge is not to be paid for by the Rail Road Co.—but the Co. shall at all times have the right of access to the [ ] & abutments of said Bridge to build, repair, or renew the same, ... I agree to construct the necessary fences, at the rate of ten cents per running foot. I also agree that in case the Courts shall at anytime decide that the above damage money belongs to others— then, in that case, I will refund the same." R.R. 1091a. The back of the document contains a statement indicating that $300.00 was received as "the amount in full for land damage according to the within agreement." R.R. 1092a.

■ PECO argues that these instruments conveyed to the Chester Valley Rail Road a fee simple title in the land. Developers argue that the interest conveyed consisted solely of a railroad right-of-way. In interpreting instruments of conveyance, our "primary object must be to ascertain and effectuate what the parties intended." *Brookbank v. Benedum–Trees Oil Company*, 389 Pa. 151, 156–57, 131 A.2d 103, 107 (1957). *See also Lawson v. Simonsen*, 490 Pa. 509, 417 A.2d 155 (1980). In determining the parties' intent, we rely on the traditional rules of interpretation:

(1) the nature and quantity of the interest conveyed must be ascertained from the instrument itself and cannot be

orally shown in the absence of fraud, accident or mistake and we seek to ascertain not what the parties may have intended by the language but what is the meaning of the words ...; (2) effect must be given to *all* the language of the instrument and no part shall be rejected if it can be given a meaning ...; (3) if a doubt arises concerning the interpretation of the instrument it will be resolved against the party who prepared it ...; (4) unless contrary to the plain meaning of the instrument, an interpretation given it by the parties themselves will be favored ...; (5) "to ascertain the intention of the parties, the language of a deed should be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed" ...

*Brookbank, supra,* 389 Pa. at 157 n. 6, 131 A.2d at 107 n. 6 (emphasis in original) (citations omitted).

■ The issue in *Brookbank* concerned what rights a railroad had to drill for natural gas under an abandoned railroad bed. In deciding this question, the Court interpreted a document containing language substantially similar to the wording of the instrument at issue here, finding that the parties intended to convey a "right of way" for railroad purposes.[2] The agreement in *Brookbank* provided:

Know All Men By These Presents, That, J.J. Ingraham and Anna Ingraham parties of the first part, for and in consideration of the sum of Three Hundred Dollars, lawful money of the United States, duly paid by the railroad company hereinafter mentioned, to us, receipt of which is hereby acknowledged, have granted, bargained, sold, released and conveyed unto the Susquehanna and Southern Railroad Company, a corporation organized under the laws of Pennsylvania, its successors and assigns, a strip of land four rods in width, and, through cuts and fills

2. The *Brookbank* court noted that a railroad right-of-way had, at times, been termed both an easement and a base or conditional fee. *Brookbank, supra,* 389 Pa. at 166 n. 23, 131 A.2d at 111–12 n. 23. The Court noted that regardless of the name given the estate, the railroad acquires simply a right to the surface and so much of the subsurface as is necessary for the support of the railroad, but does not acquire any mineral rights.

such additional widths as may be needed for slopes, one-half thereof on either side of the center line as now located, of the Susquehanna and Southern Railroad, leading from Sinnemahoning, Pennsylvania, to DuBois, Sykesville, & c., through lands of the parties above mentioned, situate in Gibson Township, Cameron County, Pennsylvania.

Together with the right to enter upon the said land and lay out, construct, maintain and operate a railroad over and across the lands belonging to the parties above mentioned, taking and using such earth, stones and gravel, as may be needed for grading and filling such road, and hereby fully releasing said railroad company, its successors and assigns, from all liability by reason of the location, construction and operation of the said railroad.

A good farm crossing and cattle guard on each side thereof to be built and maintained by said Company.

*Brookbank, supra,* 389 Pa. at 154–55, 131 A.2d at 106. The Court held that the railroad acquired a right of way for railroad purposes by virtue of this agreement.

Our review of the Court's analysis of the agreement in *Brookbank* convinces us that the instruments of conveyances in this case were intended to transfer a railroad right of way and not a fee simple interest. The determinative factors which supported the finding of a railroad right of way in *Brookbank* are factors which exist in this case. Specifically, the omission of *habendum* and warranty clauses; the specification of the rights given to the railroad; and the release relieving the railroad of liability arising from the location, construction and operation of the railroad supported the finding in *Brookbank* that the parties intended the conveyance of a right of way for railroad purposes. *Id.,* 389 Pa. at 162–64, 131 A.2d at 110–11.

The present agreements contain no clauses requiring that the landowners warrant their title to the property or describing the extent of the estate conveyed. The *Brookbank* court found it "inconceivable that the railroad would have omitted these clauses from an instrument of conveyance

under whose terms they intended to receive a fee simple estate." *Id.*, 389 Pa. at 162–63, 131 A.2d at 110. The agreements specify that the Chester Valley Rail Road has the right, liberty, and privilege of entering upon and occupying the land and the right of using, occupying, and enjoying the said land perpetually, for all the uses and purposes convenient or necessary for a Rail Road. As the *Brookbank* court noted, "[i]f the parties intended to convey a fee simple interest to the railroad, it was surplusage to give the railroad these rights because such rights would naturally belong to the railroad as holder of the fee." *Id.*, 389 Pa. at 163, 131 A.2d at 110. Finally, the instant agreements release the Rail Road Company from all claim for or right to any damages resulting from the Company's taking and using the land for the construction and use of the railroad. The *Brookbank* court held that a similar release indicated the conveyance of a right of way, because if a fee interest had been conveyed, the railroad would have a complete right to build and operate a railroad over the land. *Id.*, 389 Pa. at 163–64, 131 A.2d at 110. Given the close parallel between the instrument of conveyance in *Brookbank* and the agreements at issue here, we hold that the Chester Valley Rail Road Company secured a right of way for railroad purposes by virtue of the instruments of conveyance.

The cases cited by PECO in support of its position that the instrument conveyed a fee simple are unpersuasive. PECO also relies on an appraisal which opines that the amounts of money paid to the landowners for the land were consistent with transfers of fee simple titles to the land. In *Lawson v. Simonsen, supra*, 490 Pa. at 516, 417 A.2d at 159, the Court refused to accept the appellant's claims as to the sufficiency of consideration paid for the interest, stating that "these arguments rely on facts totally unobtainable from the written document and we are not permitted to look beyond that document in cases, like the present one, where fraud, accident or mistake, have not been alleged." *Id.*, *citing Brookbank, supra.* As neither party in this case has alleged fraud, accident or mistake, we will not go beyond

the words of the documents to ascertain the intent of the original landowners and the Chester Valley Railroad Company. The language in each of the agreements, as quoted above, indicates that the money received by the landowners was compensation for the damages which flowed from the location and construction of the railroad on the landowners' properties.

Because the Chester Valley Rail Road possessed only a railroad right of way, as opposed to a fee simple interest in the property, Conrail acquired a railroad right of way in 1976, when the interest passed to Conrail. We now must consider whether Conrail abandoned its interest in the property.

 The instruments of conveyance granted the right of way "for all the uses and purposes convenient or necessary for a Rail Road." R.R. 1091a, 1093a, 1095a. A railroad right of way terminates and the property interest reverts back to the grantor or the grantor's successors in title when the land ceases to be used for railroad purposes. *Brookbank, supra,* 389 Pa. at 167, 131 A.2d at 112; *Lacy v. East Broad Top Railroad & Coal Co.,* 168 Pa.Super. 351, 354, 77 A.2d 706, 708 (1951). To constitute abandonment, there must be an intention to abandon, accompanied by "external acts" by which the intention is carried into effect. *Id.,* 168 Pa.Superior Ct. at 358, 77 A.2d at 710.

██ The determination of whether a railroad has actually abandoned its right of way by acting upon and effecting its expressed intention to abandon is a question for a jury to decide. *Lawson, supra,* 490 Pa. at 517, 417 A.2d at 160; *Lacy,* 168 Pa.Super. at 358, 77 A.2d at 710. We find that triable factual disputes exist in this case as to whether Conrail intended to abandon the line and whether Conrail actually abandoned the line.

██ Developers argue that Conrail evidenced an intention to abandon the line when Conrail (1) ceased running trains on the line; (2) ceased maintaining the line; (3) sought and received approval from the ICC to abandon the line; and (4)

planned to dismantle the line's track. It is well-settled that nonuse of a rail line does not constitute abandonment. *Lawson v. Simonsen, supra,* 490 Pa. at 517, 417 A.2d at 158; *Lacy v. East Broad,* 168 Pa.Super. at 358, 77 A.2d at 710. Thus, Conrail's failure to operate trains on the line and maintain the line are not indicative of an intent to abandon.

 · The record does show some evidence of Conrail's intent to abandon, since Conrail applied to the ICC for permission to abandon the rail line and Conrail planned to dismantle the track. In *Lacy v. East Broad, supra,* where the railroad company applied for and obtained a certificate from the Public Utility Commission (PUC) authorizing abandonment of a portion of the railroad's right of way, the Court held that the proceedings before the PUC constituted, at most, an expression of the railroad's intention to abandon the right of way. *Id.,* 168 Pa.Superior Ct. at 356–58, 77 A.2d at 709–10. The Court also noted that a certificate of abandonment from the ICC may indicate an intent to abandon. *Id.,* 168 Pa.Superior Ct. at 359, 77 A.2d at 710–11. PECO emphasizes that the application to the ICC for abandonment was for abandonment of service, not for abandonment of the line itself. A reading of the statutory provisions under which Conrail applied for the certificate of abandonment indicates otherwise. The statute provides that Conrail may file a notice of insufficient revenues for any line which is part of its system, and after 90 days have elapsed, may thereafter file an application for abandonment of the line. 45 U.S.C. § 748(c) and (d). Provided that no offers for sale of the subject line are made, Conrail may abandon, dismantle or otherwise dispose of the rail line, except for bridges and other structures. 45 U.S.C. § 748(e). Given this statutory scheme, we find that abandonment within the meaning of the RRR Act is not limited to abandonment of service.

PECO also stresses that Conrail never applied to the PUC for a certificate of public convenience for authorization to abolish the railroad or any of its crossings, as required by 66 Pa.C.S.A. § 1102(a)(2). While the Commonwealth of

Pennsylvania ordinarily has jurisdiction over abandonment proceedings, if abandonment proceedings pursuant to the RRR Act are initiated, as they were in this case, the state scheme is preempted. *Consolidated Rail Corporation v. Pennsylvania Public Utility Comm'n*, 565 F.Supp. 153, 156 (Sp.Ct.RRRA 1983). Thus, in light of Conrail's application for and receipt of the ICC certificate authorizing abandonment and Conrail's plans for dismantlement of the track, we conclude that a jury question exists on whether Conrail intended to abandon the line.

Likewise, the record shows that there is evidence from which a jury could find that Conrail actually abandoned the rail line before selling the line to PECO. Developers cite Conrail's allowance of severance of the line and Conrail's sale of the line to PECO as external acts of abandonment. Conrail allowed the removal of tracks in certain portions of the line. A review of the record shows that Conrail could have agreed to the severance of the line at this juncture because of economic concerns or as a step in furtherance of an abandonment effort. The fact that the balance of the rail line remains an intact, viable railway is evidence to support PECO's position that Conrail did not abandon the line. We find that whether Conrail actually abandoned the line must be resolved at trial.

We disagree with the views of the trial court and the Developers that as a matter of law, abandonment of the rail line was completed when Conrail conveyed its interest to PECO, a "non-railroad." The instruments of conveyance transferred a right of way "for all the uses and purposes convenient or necessary for a Rail Road." So long as the owner of the right of way continues to use the line for railroad purposes, i.e., for the transport of goods, passengers, equipment, or other such freight by rail, the railroad will not be deemed to have been abandoned. There is no requirement that the owner of the railroad be a railroad company, per se. PECO's intended use of the line to ship transformers and other heavy equipment and machinery into the substation constitutes a use for railroad purposes.

Although the sale of the line to PECO was not made pursuant to the RRR Act, a review of the history and provisions of the RRR Act shows that a finding of abandonment in a case where a railroad sells a line to a non-carrier would be inconsistent with the RRR Act's purposes. In an effort to alleviate the crisis of railroad insolvency, Congress enacted the RRR Act in 1974, which provided, in part, for the reorganization of railroads located in the northeast corridor into an economically viable railway system. The establishment of Conrail was one of the means through which Congress intended to accomplish this goal. 45 U.S.C. § 701(b).

Recognizing that the provisions of the RRR Act enacted in 1974 failed to result in the creation of a self-sustaining railroad system in the Northeast region, Congress amended the RRR Act in 1981. *See* 45 U.S.C. § 1101. The amended provisions reflect a congressional policy which favors the purchase of Conrail's financially troubled rail lines by various entities. The RRR Act permits Conrail to sell a line which generates insufficient revenues to a "financially responsible person (including a government authority)." 45 U.S.C. § 748(d); 49 U.S.C. § 10905(d). The category of "persons" who may purchase a line is not limited to rail carriers. Hence, PECO would qualify as a person who may offer financial assistance under the RRR Act. To hold that as a matter of law, Conrail abandons a rail line by selling the line to a "non-railroad" would frustrate the remedial purpose of the RRR Act.

We have carefully reviewed the cases cited by the Developers and find that none of the cases present the precise factual and legal issues posed by the instant case. In *Chew v. Commonwealth*, 400 Pa. 307, 161 A.2d 621 (1960), the Commonwealth had condemned property on which a railroad company owned a right of way. The dispute concerned whether the railroad company or the successors of the original landowners should receive the condemnation damages. To resolve the question, the Court relied upon a provision of the Restatement of the Law of Property ad-

dressing distribution of condemnation awards; this provision required the Court to determine whether abandonment of the railroad right of way was imminent at the time of the condemnation proceeding, not whether actual abandonment had occurred. *Id.*, 400 Pa. at 310–12, 161 A.2d at 622–23. Given the railroad company's adopted resolution to substitute bus service for rail service, and the company's application to the PUC for approval to abandon railway service, the Court found that abandonment was imminent. *Id.* In *Schnabel v. County of DuPage*, 101 Ill.App.3d 553, 57 Ill.Dec. 121, 428 N.E.2d 671 (1981), the court held that the railroad company had abandoned its railroad right of way when the company tore up and removed all the rails, ties and wires necessary for the operation of the line, and had applied to the Illinois Commerce Commission for permission to discontinue railroad services. In this case, Conrail did not dismantle and remove all of its track; the rail line is still a viable means of supplying rail service. The case of *Kansas City Area Transportation Authority v. 4550 Main Associates, Inc.*, 742 S.W.2d 182 (Mo.App.1986) is also readily distinguishable in that the finding of abandonment was predicated upon the fact that the holders of the railroad right of way had ceased all rail service, removed tracks, paved over portions of the line and were using the property for parking lots and billboards.

■ We cannot conclude that as a matter of law, Conrail had abandoned the line before or when the line was sold to PECO. Because we find that the question of whether Conrail abandoned the rail line must be resolved at trial, we need not address Developers' argument that PECO has worked an unconstitutional taking of Developers' property.

For the foregoing reasons, we reverse the order granting summary judgment in favor of Developers, and remand the case to the trial court for proceedings consistent with this decision.

Reversed and remanded. Jurisdiction is relinquished.