813 A.2d 659

BUFFALO TOWNSHIP, Appellee

v.

Carl E. JONES, Kathryn L. Jones, Larry W. Tredway, Kassie Tredway, David C. Jones, Sylvia J. Jones, Jerry Purcell and Margie Purcell, Appellants.

Supreme Court of Pennsylvania.

Argued March 6, 2002.

Decided Dec. 31, 2002.

---

638

640

William Claney Smith, Philadelphia, for appellant, Carl E. Jones

Alexander H. Lindsay, Butler, for appellant amicus curiae, Summit Tp.

Lawrence Paul Lutz, Butler, for appellee, Buffalo Tp.

Gwilym A. Price, Butler, for appellee amicus curiae, Allegheny Valley Land Trust's.

Laurel Broida Hartshorn, Saxonburgh, for appellee amicus curiae Rails to Trails Conservancy and Butler–Freeport Community Trail.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN SAYLOR and EAKIN, JJ.

## OPINION

Justice CAPPY.

In this appeal, we consider whether the trial court properly granted a permanent injunction in favor of Appellee, Buffalo Township, prohibiting Appellants from interfering with Buffalo Township's recreational trail along a 20.7–mile right-of-way formerly known as the Butler Branch of the railroad that was operated by the Consolidated Rail Corporation (hereafter "Conrail"). The Commonwealth Court affirmed the trial court's order. For the reasons stated herein, we affirm the lower courts' grant of the permanent injunction in favor of Buffalo Township.

In the late 1860's, the Western Pennsylvania Railroad Company (which subsequently became part of Conrail) constructed a branch line known as the Butler Branch that ran between Freeport, Armstrong County and Butler, Butler County. During construction, the railroad obtained rights-of-way and easements over privately owned property through condemnation proceedings and right-of-way agreements.

On October 31, 1985, Conrail notified the Interstate Commerce Commission[1] (hereafter "ICC") of its intent to file an application to abandon the Butler Branch due to insufficient revenue. On June 8, 1987, Conrail filed a request for approval of abandonment of the Butler Branch with the ICC. On September 14, 1987, the ICC issued a certificate and decision authorizing Conrail to abandon the Butler Branch.

1. The Surface Transportation Board ("STB") assumed all of the functions of the ICC as of January 1, 1996. 49 U.S.C. § 702. Throughout this opinion and for ease of reference, we refer to the agency as the ICC since at the time of the transfer of the property the STB was still known as the ICC.

In the early spring of 1990, B. Sykes Limited (hereafter "B. Sykes"), a salvage company, purchased the rails and ties along the right-of-way from Conrail and removed these rails and ties. Conrail and Buffalo Township also filed a request for interim trail use pursuant to 49 C.F.R. § 1152.29(a) with the ICC. However, they withdrew this petition on September 12, 1990, after the ICC informed Conrail and Buffalo Township that it needed further information on whether Conrail had consummated abandonment of the subject property. On June 11, 1991, Conrail conveyed by quitclaim deed all of its rights, title and interest in the property to B. Sykes.[2] In turn, on June 14, 1991, B. Sykes conveyed its interest to Buffalo Township by quitclaim deed. Conrail reserved the right to reenter the land in both of the deeds. *See* Plaintiff's Exhibits 1 & 2.

In 1992, Buffalo Township began to develop the former railroad property as a recreational trail pursuant to the Pennsylvania Rails to Trails Act (hereafter "State Act"), 32 P.S. § 5611 et seq. and the National Trails System Act (hereafter "National Act"), 16 U.S.C. § 1241 et seq. Shortly thereafter, certain property owners along the right-of-way, Appellants herein, erected barriers to prevent passage on the newly developed trails asserting that Conrail had abandoned the right-of-way and thus, the right-of-way reverted to them. Buffalo Township then filed a complaint in equity in the Court of Common Pleas of Butler County and simultaneously filed a preliminary injunction seeking to enjoin Appellants from erecting barriers on its land.

On May 5, 2000, the trial court granted the preliminary injunction, preventing Appellants "from blocking, obstructing, threatening, intimidating, or coercing agents and employees of the Township of Buffalo or individuals using the Butler–Freeport Community Trail...." Memorandum Opinion and Order of Court dated July 31, 2000. On July 31, 2000, the

---

2. Appellants do not raise any challenge based upon the intermediate transfer from Conrail to B. Sykes. Thus, the effect of that intermediate transfer on the ultimate question of Buffalo Township's present property interest is not before this court.

trial court entered a final or permanent injunction [3] preventing Appellants from denying access to the trail in any manner. The trial court filed an opinion in support of its order. The court explained that Appellees demonstrated a clear right to relief, since Conrail did not abandon the railway. Further, under the National Act, a conversion of property from a railroad to trail use did not constitute abandonment. Accordingly, Buffalo Township properly acquired Conrail's interest in the property.

On appeal, the Commonwealth Court affirmed. *Buffalo Township v. Jones et al.,* 778 A.2d 1269 (Pa.Commw.2001). The court deferred to the trial court's determination that Conrail had not abandoned the right-of-way, concluding that Appellants could not meet their burden of demonstrating that the lower court abused its discretion. Additionally, the court held that Buffalo Township was not required to obtain ICC approval for the interim trail use so long as it in fact complied with the requirements of the National Act. Accordingly, the Commonwealth Court determined that the trial court's order granting "injunctive relief enjoining Property Owners from interfering with the public's use of the trail was appropriate." *Id.* at 1277.

This court granted allowance of appeal to consider whether the trial court properly granted a permanent injunction to Buffalo Township.

Appellants argue that Conrail abandoned the right-of-way prior to the transfer of the property to Buffalo Township via a quitclaim deed. According to Appellants, Conrail abandoned the property either when it filed a certificate of abandonment with the ICC or when it authorized salvage of the railroad tracks. Thus, Conrail had abandoned its interest in the property prior to the time it transferred its "interest". Alternatively, upon transfer of the property, Conrail abandoned the property since its interest in the property was limited solely to railroad purposes. Further, Appellants maintain that the lower courts improperly relied upon the National Act in

3. Courts refer to the injunction as either final or permanent.

determining that the property was not abandoned, since Conrail and Buffalo Township did not comply with the requirements of the National Act, and thus, that Act cannot preserve the transfer of the property to Buffalo Township. Accordingly, Appellants conclude that the property reverted to them under common law and the lower courts erred in granting the injunction in favor of Buffalo Township. Finally, Appellants assert that even if the property was not abandoned, the lower courts improperly granted the injunction, since Buffalo Township did not establish either a need for immediate relief or irreparable harm. Additionally, Appellants conclude that the trial court erred in failing to refer the abandonment issue to a jury.

Buffalo Township responds that the land was not abandoned at the time of the quitclaim deed, thus Conrail properly transferred its interest in the property. Further, the National Act and the State Act allows the transfer of the property. Alternatively, Buffalo Township offers that case law from Pennsylvania allows a railroad company to transfer the land to further a public use or purpose. In this case, the transfer served such purpose and thus, the property did not revert to the underlying landowners.

Initially, we note that in order to establish a claim for a permanent injunction, the party must establish his or her clear right to relief. *See Boyle v. Pennsylvania Interscholastic Athletic Ass'n., Inc.,* 676 A.2d 695, 699 (Pa.Commw.1996). However, unlike a claim for a preliminary injunction, the party need not establish either irreparable harm or immediate relief and a court "may issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law." *Soja v. Factoryville Sportsmen's Club,* 361 Pa.Super. 473, 522 A.2d 1129, 1131 (1987). Additionally, when reviewing the grant or denial of a final or permanent injunction, an appellate court's review is limited to determining whether the trial court committed an error of law.[4]

4. The intermediate courts have expressed that the standard of review for the grant or denial of a permanent injunction is whether the trial court abused its discretion or committed an error of law. *See Boyle v.*

 In order to address Appellants' claims in this matter, we must first consider the nature of the property interest of the parties and whether Conrail abandoned its property interest under state law.[5] The common law provided that the property interest reverted to the grantor or the grantor's successors upon abandonment of a railroad right-of-way. *See Brookbank v. Benedum–Trees Oil Co.*, 389 Pa. 151, 131 A.2d 103, 112 (1957); *Quarry Office v. Philadelphia Electric Co.*, 394 Pa.Super. 426, 576 A.2d 358, 363 (1990). "[A]n estate in reversion is the residue of an estate left to the grantor, to commence in possession after the determination[6] of some

*Pennsylvania Interscholastic Athletic Ass'n., Inc.*, 676 A.2d 695, 699 (Pa.Commw.1996); *Licensed Beverage Ass'n. of Philadelphia v. Bd. of Educ. of the School District of Philadelphia*, 669 A.2d 447, 449 n. 3 (Pa.Commw.1995). These courts have imported this standard of review from reviewing the grant or denial of a preliminary injunction. However, as noted above, the test for the issuance of the two types of injunctions is not the same. While we do not question the standard as it relates to preliminary injunctions, we do not agree that this standard is appropriate for permanent injunctions. Ultimately, the grant or denial of a permanent injunction will turn on whether the lower court properly found that the party seeking the injunction established a clear right to relief as a matter of law. This inquiry involves a legal determination by the lower court. Accordingly, we think it proper that appellate review in these cases is whether the lower court committed an error of law in granting or denying the permanent injunction. Our standard of review for a question of law is de novo. *Seven Springs Farm, Inc. v. Croker*, 569 Pa. 202, 801 A.2d 1212, 1216 n. 1 (2002). Our scope of review is plenary. *See ODC v. Jepsen*, 567 Pa. 459, 787 A.2d 420 (2002).

5. Both parties cite federal law in support of their positions. However, our inquiry is directed at whether Conrail's property interest in the right-of-way reverted to Appellants. "State law generally governs the disposition of the reversionary interests, subject of course to the ICC's 'exclusive and plenary' jurisdiction to regulate abandonments, and to impose conditions affecting postabandondment use of the property." *Preseault v. ICC et al.*, 494 U.S. 1, 8, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990); *see e.g. Chatham v. Blount County*, 789 So.2d 235, 241 (Ala. 2001). In other words, the ICC has jurisdiction to make determinations regarding abandonment of the railroad line and conditions placed upon such abandonment and thus, such decisions are subject to federal law. However, state law controls the disposition of the underlying property interest. *See* Danaya C. Wright, *Eminent Domain, Exactions, and Railbanking: Can Recreational Trails Survive the Court's Fifth Amendment Takings Jurisprudence?* 26 COLUMBIA J. ENVTL. L. 399, 446–47 (2001).

6. Determination is defined as "[t]he ending or expiration of an estate or

646

particular estate granted out by him." *Smith v. Glen Alden Coal Co.*, 347 Pa. 290, 32 A.2d 227, 234 (1943) (citing Blackstone, Vol. 2. § 176). A reversionary interest is used to define the interest that a person has in the reversion of property. *See* BLACK'S LAW DICTIONARY 1186 (5th Edition 1979). It is the right to "the future enjoyment of property, at present in the possession or occupation of another." *Id.* Thus, upon the determination of the railroad's estate, i.e., abandonment of the right-of-way by the railroad, the property would "revert" to the landowner.

In evaluating whether the user abandoned the property, the court must consider whether there was an intention to abandon the property interest, together with external acts by which such intention is carried into effect. *Lawson v. Simonsen*, 490 Pa. 509, 417 A.2d 155, 160 (1980); *see also Burnier v. Dep't of Envtl. Resources*, 148 Pa.Cmwlth. 530, 611 A.2d 1366, 1368 (1992). In order to establish the abandonment of a right-of-way, the evidence must show that the easement holder intended to give up its right to use the easement permanently. *Thompson v. R.R. Preservation Society*, 417 Pa.Super. 216, 612 A.2d 450, 453 (1992). "Such conduct must consist of some *affirmative act* on his part which renders use of the easement impossible, or of some *physical obstruction* of it by him in a manner that is inconsistent with its further enjoyment." *Id.* (emphasis in original); *see also Piper v. Mowris*, 466 Pa. 89, 351 A.2d 635, 640 (1976). Mere nonuse by the railroad does not amount to abandonment. *Lawson*, 417 A.2d at 160; *see also Burnier, supra.*

In determining the intent of the parties, the intermediate courts have considered a myriad of factors. For example, in *Birdsboro Municipal Auth. v. Reading Co. and Wilmington & Northern R.R.*, 758 A.2d 222, 227 (Pa.Super.2000), the court held that a mere failure to maintain and repair existing tracks did not amount to an intent to abandon. In *Thompson v. Maryland and Pennsylvania R.R. Preservation Soc.*, 417 Pa.Super. 216, 612 A.2d 450, 454 (1992), the court held that

interest in property." BLACK'S LAW DICTIONARY 405 (5th Edition 1979).

evidence that the railroad company entered into salvage agreements and quitclaimed its interest in the subject property should be submitted for the factfinder to resolve the railroad's intent to abandon. Courts in this Commonwealth have also indicated that the filing of a certificate of abandonment with the ICC or PUC demonstrated intent to abandon, but cautioned that in order to justify a finding of abandonment, the filing of the certificate must be coupled with external acts in furtherance of abandonment. *Chew v. Commonwealth,* 400 Pa. 307, 161 A.2d 621, 624 (1960); *Lacy v. East Broad Top Railroad & Coal Co.,* 168 Pa.Super. 351, 77 A.2d 706, 710 (1951); *see also Thompson, supra.*

In sum, many different factors can be considered when making a determination of abandonment. Moreover, no single factor alone is sufficient to establish the intent to abandon. Abandonment must be determined based upon all of the circumstances surrounding the alleged abandonment.

Turning to the instant case, we must consider whether the trial court's decision that Conrail did not abandon its property interest in the subject property was reasonable.[7] In ascertaining Conrail's intent, the trial court examined all the circumstances surrounding the alleged abandonment. In this case, Conrail took certain action that suggested an intention to abandon the railroad line, such as filing a request to abandon rail service with the ICC and entering into an agreement with B. Sykes for salvage of the rails. However, Conrail took other steps evidencing the contrary intent, such as participating in ongoing negotiations with Buffalo Township for the use of the land and expressly retaining the right to

7. The parties do not dispute the equity court's findings of facts. Rather, Appellants argue that those facts, taken in their entirety, amount to abandonment. Questions of abandonment are heavily fact-driven decisions. *Lawson,* 417 A.2d at 159–60; *Thompson,* 612 A.2d at 453. In reviewing fact-laden decisions, an appellate court displays a high level of deference to the trial court as the fact finder. *See, e.g.,* Martha Davis, *Standards of Review: Judicial Review of Discretionary Decisionmaking,* 2 J. APP. PRAC. & PROCESS 47 (Winter 2000). Accordingly, our standard of review regarding an issue of abandonment is whether "a judicial mind, on due consideration of all the evidence, as a whole, could reasonably have reached the conclusion of that tribunal." *Aiken Indus., Inc. v. Estate of Wilson,* 477 Pa. 34, 383 A.2d 808, 810 (1978).

reenter the land for future railroad use in the deed. Ultimately, the trial court was persuaded by these latter factors and concluded that Conrail did not abandon the right-of-way. In fact, these latter factors demonstrated Conrail's intent to *retain* an interest in the right-of-way. Accordingly, on due consideration of all of the evidence, we find that the equity court reasonably concluded that Conrail did not abandon the Butler Branch. *See Aiken, supra* n. 6.

Having concluded that Conrail did not abandon its interest in the property prior to the transfer of the property to Buffalo Township, we must address Appellants' argument that upon transfer of the property to an entity that was not a railroad company the property reverted to Appellants. Appellants' argument is premised on Buffalo Township's withdrawal of its interim trail use application with the ICC. According to Appellants, formal ICC authorization was necessary to transfer the property for a non-railroad purpose.[8]

In order to place Appellants' argument in context, we must first provide some background of the relevant pieces of legislation and the purpose for the legislation.

In *Preseault v. ICC et al.*, 494 U.S. 1, 5–6, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990), the Court was faced with a challenge to the constitutionality of the National Act under the Takings Clause of the United States Constitution. U.S. Const. amend. V. By way of background, the Court first traced the history of the National Act. The Court explained that Congress was motivated to preserve the loss of railroad lines across the United States [9] and enacted the Railroad Revitalization and Reform Act (hereafter "Reform Act") in 1976.[10] The Reform Act

8. In this case, the question of whether Conrail's right-of-way was limited to railroad purposes is a question of law. Accordingly, our standard of review is de novo and our scope of review is plenary. *See* supra n. 4.

9. · In 1920, the Nation's railroad track reached its peak of 272,000 miles of track. By 1990, only about 141,000 miles were in use, and experts predicted that the amount of track would decrease by 3,000 miles per year through 2000. *Preseault,* 494 U.S. at 5, 110 S.Ct. 914.

10. The original version of the National Act was enacted in 1968 and known as the National Trails System Act.

encouraged the conversion of railroad tracks to recreational trails. *Id.* However, the Reform Act was unsuccessful in furthering this purpose and in response thereto, in 1983, Congress enacted amendments to the previously enacted National Act, including the addition of subsection (d) to 1247 of the National Act.[11] *Id.* at 6–7, 110 S.Ct. 914. This subsection sought to "preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use." 16 U.S.C. § 1247(d). In order to accomplish this purpose, the subsection provided that:

> in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.

16 U.S.C. § 1247(d). Thus, the effect of this subsection was to deem certain interim trail use a "discontinuance" as opposed to an "abandonment," which had the effect of preventing "property interests from reverting under state law." *Preseault*, 494 U.S. at 8, 110 S.Ct. 914. Ultimately, the Court held this provision constitutional.

Pennsylvania, following the federal lead, enacted the State Act, effective ninety days after December 18, 1990.[12] 32 P.S. § 5611. This legislation gave the Department of Environmental Resources the authority to participate in rails to trails conversions for the purpose of developing "available railroad rights-of-way for public recreational use." 32 P.S. § 5613. The State Act also gave counties or municipalities the right to "accept title to available railroad rights-of-way conveyed by quitclaim deed or warranty deed." 32 P.S. § 5614(c)(2).

11. Congress noted that the amendments may be cited as "National Trails System Act Amendments of 1983." 16 U.S.C. § 1241, History.

12. The date the State Act became effective was prior to the transfer of the property to Buffalo Township, thus we may consider the State Act in reviewing the validity of the transfer to Buffalo Township.

Both the National Act and the State Act display a strong legislative policy encouraging the preservation of railroad rights-of-way by using existing rights-of-way for interim recreational trail use. The National Act accomplishes this directly by providing that "interim trail use" is a "discontinuance" rather than an "abandonment" of the prior railroad use, thus preventing the right-of-way from reverting under state law. *Preseault.* The State Act demonstrates its intent by giving counties and municipalities the right to accept title to the railroad rights-of-way. The inescapable effect of these Acts is to allow a railroad company to transfer its possessory interest in the land, i.e., the right-of-way, to a third party for the limited purpose of interim recreational trail use. The interim trail user essentially holds the railroad company's land in trust until the railroad needs to reactivate service on the rail line. In this way, the legislature has effectively prevented the further loss of railroad track. *See Preseault supra.* Thus, upon the conversion of a railroad line to a recreational trail, the railroad's right-of-way does not terminate but is held in abeyance, and thus, the land does not revert to the property owner.

Keeping these general principles in mind, we now turn to Appellants' specific argument. Appellants insist that the only way the National Act could preserve the right-of-way was if Buffalo Township filed an interim trail use application with the ICC. In the absence of formal ICC authorization, the property reverted to Appellants pursuant to the common law. Appellants find support for their argument in the language of the National Act and the ICC regulations. *See* 49 C.F.R. § 1152.29.

Before beginning our analysis of Appellants' argument, we must point out that we are unable to find any case law on point with the instant case, since the proposed trail user normally files an interim trail use application with the ICC. Thus, we will first set forth the pertinent portion of the statute and regulations and then look at case law, which has spoken to

the statute and regulations in other contexts, to aid us in addressing Appellants' argument.

The relevant portion of section 1247(d) states that:

If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board **shall impose such terms and conditions** as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

16 U.S.C. § 1247(d)(emphasis added). Additionally, the ICC regulations provide that if the proposed trail user intends to acquire a rail line for interim trail use, "it must file a comment or otherwise request in its filing [with the ICC] . . . indicating that it would like to do so." 49 C.F.R. § 1152.29(a). The regulations set forth the required information for any interim trail use application and provide the relevant time limits for the application process. 49 C.F.R. § 1152.29(a)(1)–(a)(3) and (b)(1).

Appellants argue that the statutory language, indicating that the ICC can impose terms and conditions on any transfer, implies that the ICC must sanction the transfer in order for it to be effective. However, as noted by the Commonwealth Court in this case, there is nothing in the language of the statute requiring a trail owner, such as Buffalo Township, to comply with the ICC regulations. *Buffalo Township*, 778 A.2d at 1276. The language in the statute referring to "terms and conditions," 16 U.S.C. § 1247(d), merely relates to the managerial, financial, and legal responsibility of the trail user and clarifies the obligations that the interim trail user must fulfill in order for the trail conversion to occur. However, this language does not impose any filing obligation on the trail user; rather, any requirement of formal ICC intervention is merely by implication. We refrain from reading such a requirement into the statute where the language of the statute

itself does not make such a requirement mandatory for trail conversion.

Further support for our conclusion is provided by a decision of the ICC.[13] In 1991, the ICC entertained the issue of whether a railroad spur was subject to its regulation. *Southern Pacific Transportation Co., Exemption,* 1991 WL 108272 (I.C.C.1991). The ICC concluded that the spur was subject to state regulation and thus, exempt from its abandonment jurisdiction. *Id.* After reaching this conclusion, the ICC also revoked its Notice of Interim Trail Use ("NITU") because it only had authority to impose trail use where it can authorize abandonment. *Id.* After revoking the NITU, the ICC nevertheless stated, "that the underlying right-of-way can be preserved under 16 U.S.C. § 1247(d) without ICC authorization." *Id.* "The second sentence of section 1247(d) applies to 'any established railroad rights-of-way' and the statute itself provides that their interim trail use 'shall not be treated . . . as an abandonment of the use of such rights of way for railroad purposes.'" *Id.* Thus, in its administrative decision in *Southern Pacific,* the ICC indicated that the statute in and of itself supported a finding that railroad rights-of-way could be preserved in the absence of ICC authorization.

As to Appellants' argument regarding the ICC regulations, we acknowledge that the language of the regulations appears to support Appellants' argument. Yet, upon closer examination, it becomes clear that Buffalo Township did not need to comply with the regulations in order for the trail conversion to be valid.

The ICC has repeatedly stated that its function with regard to regulating trail use is ministerial. "The Commission is not involved in the negotiations between a railroad and trail use proponent. Nor does it analyze, approve, or set the terms of a

13. Courts normally defer to the agency's interpretation of its own regulations. *See, e.g., Edelman v. Lynchburg College,* 535 U.S. 106, 122 S.Ct. 1145, 152 L.Ed.2d 188 (2002) (*citing Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *Pennsylvania Liquor Control Bd. v. Richard E. Craft American Legion Home Corp.,* 553 Pa. 99, 718 A.2d 276, 279 (1998) (Newman, J. dissenting).

trail use agreement." Study of Interstate Commerce Commission Regulatory Responsibilities, 1994 MCC Lexis 104 (October 12, 1994).

Federal case law has embraced the ICC's assertion that its function with regard to trail conversions is perfunctory. For example, in *Goos v. ICC,* 911 F.2d 1283 (8th Cir.1990), the court entertained the question of whether the ICC needed to comply with the National Environmental Policy Act ("NEPA") when it granted a NITU pursuant to § 1247(d). Appellants argued that the ICC had to perform an environmental assessment pursuant to the NEPA before granting the NITU. In order to answer this question, the Court of Appeals for the Eighth Circuit needed to consider whether the issuance of a NITU or Certificate of Interim Trail Use ("CITU") constituted a "major federal action" obliging the ICC to fulfill the requirements of the NEPA.

In concluding that the ICC did not need to satisfy those requirements, the court accepted the ICC's argument that its issuance of a NITU or CITU is incidental to the abandonment process and merely provides an opportunity for the parties to negotiate a trail use agreement. *Goos,* 911 F.2d at 1293. Moreover, the ICC *"must* issue an NITU or CITU when a private party files a statement of willingness to assume financial responsibility and the railroad agrees to negotiate." *Id.* at 1295 (emphasis in original). The court stated:

> The I.C.C. interprets the section to give it no power to compel a conversion between unwilling parties, and, conversely, no discretion to refuse one if voluntarily negotiated. Once the parties reach agreement, the I.C.C. suggests that it cannot refuse to permit trail use.

*Id.* Thus, the court agreed that the ICC had "little, if any discretion to forestall a voluntary [trail use] agreement" and held that the ICC's action in these matters was ministerial and therefore, was outside the ambit of the NEPA requirements. *Id.* at 1295–96.

Other courts, following the lead taken by the court in *Goos,* have reached a similar result. *See, e.g., Citizens Against*

*Rails–to–Trails v. Surface Transportation Board,* 347 U.S.App.D.C. 382, 267 F.3d 1144, 1153 (2001) (rejecting Petitioners' argument that the Board [ICC] has discretion with regard to the issuance of a CITU); *see also Jost v. Surface Transportation Board,* 338 U.S.App.D.C. 289, 194 F.3d 79, 89 (1999) ("The Act is clear that the Board 'shall' impose a trail condition ... whenever a railroad is prepared to convey the right of way to an organization that is 'prepared to assume full responsibility' for management of the line.").

Based upon the above, we can surmise that the ICC's involvement in trail conversions is merely procedural. The regulations provide the procedure for the proposed interim trail user to follow for obtaining the NITU or CITU, which in turn, gives the parties the opportunity to negotiate an interim trail agreement. *See, e.g. Goos,* 911 F.2d at 1293. However, the regulations have no effect on the substance of the trail use agreement, rather the substance of the agreement is governed by the requirements of 16 U.S.C. § 1247(d). In other words, the ICC's action with regard to trail conversions amounts to no more than a "rubber stamp" authorizing trail conversions so long as the proposed trail user complies with the requirements of 16 U.S.C. § 1247(d). Section 1247(d) does not require that the proposed trail user file an application with the ICC. Rather, under section 1247(d), the right-of-way can be preserved so long as the interim use is subject to restoration or reconstruction by the railroad company and the trail user is willing to assume full managerial, financial and legal responsibility for the management of such rights-of-way and for any liability arising out of such transfer or use. Therefore, a railroad right-of-way can be converted to a recreational trail where there is a failure to file an application with the ICC, so long as the proposed trail user complies with the requirements of section 1247(d).

In this case, Buffalo Township agreed to take all financial, legal, and managerial responsibility for the trail and Conrail reserved a right to reactivate railroad service if the need ever arose. Thus, the transfer complied with the requirements of section 1247(d). Additionally, the Butler

Branch is an established railroad right-of-way. *Southern Pacific, supra.* As such, the right-of-way can be preserved under the National Act. We refuse to nullify the trail conversion in this instance due to the Township's failure to file an application with the ICC, especially where the ICC's actions in this area amount to no more than a rubber stamp of the application filed by Buffalo Township. We appreciate that if Buffalo Township had not made the inexplicable decision to withdraw its application with the ICC, then the legal action in this case would have been unnecessary. Nevertheless, this lapse does not affect our legal determination that the transfer of the right-of-way to Buffalo Township was effective even in the absence of filing an application for interim trail use with the ICC. Our decision today furthers the legislative purpose to promote interim trail use in order to preserve the railroad company's interest in the property, since Buffalo Township will preserve the right-of-way for the railroad company's future use. Thus, contrary to Appellants' argument, the land did not revert to them and the trial court properly enjoined Appellants from interfering with Buffalo Township's property interest.

Our analysis does not end here, since Appellants challenge the trial court's determination on two other bases. First, Appellants argue that the trial court erred in finding that Buffalo Township established a need for immediate relief and irreparable harm. However, this argument is without merit. As noted at the outset, *see supra* at 3, the trial court granted a *permanent* injunction in this matter, and as such, consideration of irreparable harm and need for immediate relief are not elements that are required for the issuance of a permanent injunction. *Soja, supra.*

Second, Appellants argue that the trial court should have submitted the issue of abandonment for jury consideration. Appellants point to numerous cases, which suggest that abandonment is an issue for the jury to decide. Appellants overlook that a motion for a preliminary or permanent injunction is a matter in equity, and thus, the court "on its own motion or upon the petition of any party may submit to trial

by jury." Pa.R.C.P. 1513. A jury's verdict in equity cases is merely advisory, since they "shall not be binding upon the court." Ultimately, it would have been within the trial court's discretion to submit the issue to the jury and to decide whether to accept the jury's determination regarding abandonment.[14]

Based upon the analysis herein, we affirm the decision of the Commonwealth Court.

Justice SAYLOR files a dissenting opinion in which Justice NIGRO joins.

Justice SAYLOR, dissenting.

In rejecting Appellants' contention that their right to a jury trial was implicated, the majority indicates that Appellants overlook that a request for preliminary or permanent injunction is addressed to a court's equitable jurisdiction, and there simply is no right to a jury trial in an equity action. *See* Majority Opinion, *slip op.* at 16–17. Appellants, however, do address this point, in effect, with the contention that it was improper for the common pleas court to invoke its equitable

---

14. We disagree with the dissenting opinion's suggestion that it was improper for Appellee to invoke the trial court's equitable jurisdiction. In *Williams v. Bridy*, 391 Pa. 1, 136 A.2d 832 (1957), we explained that "[i]t is the duty of the court when an injunction bill has been filed to inquire and ascertain whether the individual or corporation seeking the relief has a clear legal right to the use, occupation, or enjoyment of the property or right, the invasion of which it sought to be enjoined." *Id.* at 836. If a clear legal right to the property exists then an action in equity is proper. *Id.* As the dissent acknowledges, the trial court concluded that the facts were clear and there was no room for doubt and thus, Appellee properly invoked the equitable jurisdiction of the trial court. Dissenting slip opinion at 2. Our appellate review confirms the trial court's decision and we likewise conclude that Appellee had a clear legal right to the possessory property interest in this case.

The dissent also injects an issue regarding actual possession into this case by citing to the recent Supreme Court of Pennsylvania case *Siskos v. Britz*, 567 Pa. 689, 790 A.2d 1000 (2002). *Siskos* is inapt to any analysis in this case. The question in that case was whether the court must rule upon possession before determining whether an Action in Ejectment lies in a particular case. We are not entertaining a similar issue in this case.

jurisdiction to resolve what is effectively a land title controversy.

I find merit in this argument. *See Williams v. Bridy,* 391 Pa. 1, 7, 136 A.2d 832, 836 (1957); *see also Teacher v. Kijurina,* 365 Pa. 480, 484–85, 76 A.2d 197, 200 (1950) ("title to real estate is ordinarily not properly raised by an action in equity unless it be by bill in partition, for the sound reason that in ejectment proceedings (the classic method of determining title to real estate), the parties are entitled to have disputed facts settled by a jury"); *accord Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 470, 471–73, 82 S.Ct. 894, 896–97, 8 L.Ed.2d 44 (1962). Indeed, in the present case, the common pleas court recognized the salient restrictions on its equitable jurisdiction, but merely circumvented them by indicating that the facts were clear and there was no room for doubt. *See Buffalo Twp. v. Jones,* EQ. No. 00–50009, *slip op.* at 6 (C.P. Butler Jul. 31, 2000). However, the question whether title reverted to Appellants by virtue of an abandonment of Conrail's right-of-way appears to have been keenly disputed, is treated as a fact-laden issue by the majority, and is itself within the range of issues in a land title controversy that must be determined by a jury. *See generally Quarry Office Park Assoc. v. Philadelphia Elec. Co.,* 394 Pa.Super. 426, 436, 576 A.2d 358, 363 (1990).

In my view, the common pleas court's order could potentially be validly sustained (putting aside other questions of appropriate procedure) if the record established that Appellee maintained actual possession of the disputed tracts as of the time of the filing of its complaint. *Cf. Siskos v. Britz,* 567 Pa. 689, 701–02, 790 A.2d 1000, 1008 (2002) (establishing actual possession as the litmus in determining whether a right to a jury trial pertains in a land controversy). However, the common pleas court made no specific finding in this respect, and, although the record is somewhat vague on the point, there appears to be evidence that one or more of Appellants may have held actual possession for a substantial time period, including in the relevant time frame. *See, e.g.,* N.T., May 24, 2000, at 21, 26, 64, 68; N.T., July 5, 2000, at 131, 154, 171–72;

N.T., Jul. 24, 2000, at 11, 15, 24, 29. Accordingly, I am unable to join the majority in approving the grant of a permanent injunction on the record presented.

Justice NIGRO joins this dissenting opinion.