BIG BASS LAKE COMMUNITY ASSOCIATION

v.

Mark WARREN and Michael Dennehy, Appellants.

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 30, 2010.

Decided June 22, 2011.

Lisa A. Welkey, Pittston, for appellants.

Gregory D. Malaska, Stroudsburg, for appellee.

BEFORE: McGINLEY, Judge, and LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge LEAVITT.

Mark D. Warren and Michael F. Dennehy (collectively, Lot Owners) appeal a mandatory injunction issued by the Court of Common Pleas of Wayne County (trial court), on remand from this Court, direct-

ing Lot Owners to remove a landscaping wall from their property. The trial court did so because the wall was found to interfere significantly with the use of a road located in Big Bass Lake Community (Big Bass) and with a utility easement. We reverse.

This matter first came before this Court in 2008. At issue in that appeal was a permanent injunction issued against Lot Owners to remove a landscaping wall. *Big Bass Lake Community Association v. Warren*, 950 A.2d 1137 (Pa.Cmwlth.2008) (*Big Bass I*). We vacated the injunction because the trial court had converted a hearing on a preliminary injunction into a hearing on a permanent injunction, which was improper because it was done without notice to, or agreement of, the parties. The remand order provided instructions to the trial court on the issues to be considered upon remand.

The facts are these. Individual lot owners in Big Bass are bound by a series of restrictive covenants that govern the use of their property. Declaration of Covenants Pertaining to Land of Big Bass Lake, Inc. (Covenants), Supplemental Reproduced Record at 30b–38b (S.R.R. _____). In 2006, the Big Bass Lake Community Association (Association) initiated a suit in equity to enforce two covenants. The first, Covenant VII, established a utility easement, which authorized the Association to install utility fixtures and utility lines on that part of a lot owner's property burdened by the easement.[1] The second, Covenant III, guaranteed lot owners the right to use Association roads.[2] The Association's lawsuit alleged that Lot Owners had violated these covenants in several ways.

Specifically, on April 1, 2006, Lot Owners began a landscaping project designed to give them more privacy. To that end, they created a raised ground planter for trees and bushes bordered by a stone retaining wall approximately two feet high and approximately 50 feet long. The wall is constructed of boulders and stones that have been laid dry, *i.e.*, without mortar. Most of the wall parallels State Park Drive, a private road approximately 20 feet wide that has been placed within the Association's 40–foot wide right-of-way. Lot Owners' wall lies two to three feet from the road's paved edge.

Two or three days after the project began, an employee of the Association, Rebecca Kallensee, spoke to Mark Warren, and informed him that the wall interfered with the Association's utility easement, *i.e.*, Covenant VII. Thereafter, she faxed Lot Owners a copy of the "plot plan" of their property with the message that she hoped "this information will be helpful to you in relocating your planter walls and trees." S.R.R. 237b.

---

1. Covenant VII provides, in relevant part:
   Grantor reserved unto itself an easement to install or cause to be installed or permit to be installed by others, on, over, or beneath the surface of any Lot or other land area in the Development utility line or lines in the ten foot (10) wide areas extending inwardly from any boundary line of any Lot or other land area (street or interior).
   S.R.R. 36b.

2. Covenant III provides, in relevant part:
   Grantor hereby covenants and agrees that Grantee shall have ingress and egress, at all times, on the Private Roads ... in common with the Grantor or the Association and all other owners of part of the Development. Irrespective of any transactions between Grantor and the Association or any other person or persons or bodies, that right of use in Grantee shall never be interfered with or terminated excepting for possible relocation as hereinafter provided or when temporarily unavoidable for maintenance purposes.
   S.R.R. 31b.

On April 26, 2006, Lot Owners' counsel sent a letter to Kallensee noting that the covenants did not restrict a landowner's ability to landscape within the Association's easements. In response, the Association wrote to Lot Owners that their stone wall "encroaches onto Association property and the utility easement running along [Lot Owners'] property border." S.R.R. 102b. The letter threatened legal action if Lot Owners did not remove the wall. In the meantime, Lot Owners identified 297 other properties in the community with landscaping improvements that used boulders and walls and had been along the road and within the Association's 40-foot wide right-of-way.

On December 19, 2006, the Association instituted a suit in equity to compel Lot Owners to "remove any and all boulders and landscaping improvements within the [Association's] right of way abutting [Lot Owners'] property." Certified Record, Item No. 1, at 8. The Association also sought to have Lot Owners pay the Association "all reasonable enforcement costs incurred in this matter." *Id.* With the complaint, the Association filed a motion for preliminary injunction, on which a hearing was held. At the conclusion of the hearing, the trial court issued a permanent injunction, ordering Lot Owners to remove their above-ground planter, but denying the Association's claim for attorney fees.

Both parties appealed to this Court. We concluded that the trial court erred in issuing a permanent injunction. Absent agreement of the parties, the trial court lacked authority to convert a hearing on a preliminary injunction into one on a permanent injunction. *Big Bass I,* 950 A.2d at 1149. We also held that, in any case, the Association had failed to show a clear legal right to injunctive relief because the Association had not proved a violation of the cited covenants. The Court explained

that Covenant VII does not prohibit landscaping projects within the utility easement. Further, Covenant III conferred rights, not burdens, upon the lot owners; indeed, Covenant III *obligates the Association* not to interfere with the right of lot owners to use the private road.

We then identified lacunae in the record. *Big Bass I,* 950 A.2d at 1147–1148. The nature of the Association's right-of-way was unclear, *i.e.,* it could not be determined if the Association's right-of-way derived from fee simple title or from an easement. We also noted that the mere existence of an encroachment on an easement is not enough. To be actionable, an encroachment must significantly interfere with the use of the right-of-way. *Id.* at 1147. Further, in balancing the harms, the trial court had to consider the Association's longstanding tolerance of encroachments by other homeowners in Big Bass. Finally, it was noted that injunctive relief had to be tailored to be the minimum necessary to remedy the harm, which the trial court had not done. Instead of requiring the stone wall to be pushed back or reduced in height, the trial court simply ordered Lot Owners to remove the wall entirely. All these matters were to be considered on remand.

After the remand, the Association filed an amended complaint on September 12, 2008. The amended complaint pled four causes of action against Lot Owners: (1) trespass, (2) violation of Covenant VII, (3) violation of Covenant III, and (4) a claim for attorney's fees. Prior to trial, the parties agreed to conduct the litigation in two separate phases, *i.e.,* the first to determine liability and the second to consider enforcement costs. A trial on the amended complaint was held on April 28, 2009, at which both parties presented evidence.

The Association presented the testimony of Donald Chappa, the former Association

president and director. Chappa explained that the Association uses the utility easement for drainage, water lines, sewer lines, and utility lines and poles. He asserted that Lot Owners' stone wall impedes future water and sewer hookups because the rocks will need to be removed to permit any utility work to be done in the easement area. With respect to the stone wall's encroachment on the Association's right-of-way, he explained that other encroachments in the community are not as close to the paved road and are not located on such a "severe curve" in the road. Notes of Testimony, April 28, 2009, at 36 (N.T. ____); Reproduced Record at 51 (R.R. ____).

Next, the Association presented Steve Scorzelli, the Association maintenance manager, who testified that Lot Owners' stone wall hinders the Association's ability to clear snow from the road. He explained that the area adjacent to the stone wall quickly fills up with plowed snow, requiring the snow plow to make multiple passes on the road in front of Lot Owners' property. He testified that there is no other site in Big Bass that presents a comparable challenge to snow removal.

Brian Fisk, a professional engineer, provided expert testimony for the Association. He testified that the distance between the stone wall and the edge of the road ranges from two to three feet. His December 30, 2008, expert report described the stones in the wall as "unyielding objects." S.R.R. 263b. Fisk explained that in preparing his report, he relied on guidelines developed by the American Association of State Highway and Transportation Officials (AASHTO Guidelines), which are the default regulations when there is no other specific guidance for a road.[3] For high-volume roads, the AASHTO Guidelines re-

quire a 7 to 10 foot clear zone along the side of a road, which permits a driver who loses control of his vehicle an opportunity to regain control and avoid an accident. Fisk testified that Lot Owners' wall should have been placed 10 to 15 feet from the edge of the road because it was next to a bend in the road. Fisk concluded that the wall presented a "significant traffic hazard" and was the most dangerous such hazard in Big Bass. N.T. 103; R.R. 118.

In response, Lot Owners presented the testimony of Mark Warren, one of the two Lot Owners, who explained that a raised planter is the only way he can landscape his property with vegetation because of the thin soil on his property. He also testified that there are other raised planters also using stone walls in Big Bass that are similar in design and proximity to the road.

Kenneth Acker, a professional engineer and registered land surveyor, testified for Lot Owners. He testified that all of the stone planters on Lot Owners' property are located, at least in part, within the Association's 40–foot right-of-way and that approximately 50 feet of the planter wall is located within the utility easement. Acker testified that he surveyed five properties in Big Bass that contained stone walls located equally close to the road. On cross-examination, however, Acker conceded that these other stone walls were not located at a place where the road bends.

Next, Thomas Reilly, a professional engineer, a registered land surveyor and licensed landscape architect, testified on behalf of Lot Owners. He testified that Fisk erred in using the AASHTO high volume road standards to support his opinion that the wall had to be 7 to 10 feet from the

---

**3.** The AASHTO guidelines provide "an authoritative national and state code [of] recommendations and policies for [the] design of roads." N.T. 188; R.R. 203.

road. Reilly testified that the AASHTO standards specific to a low volume road are the appropriate ones to apply to State Park Drive. A low volume road is one with average daily traffic of less than 400 vehicles per day, and the average daily traffic on State Park Drive is 250 vehicles per day. Reilly calculated this number of vehicles by using the methodology recommended by the Institute of Traffic Transportation Engineers. N.T. 189; R.R. 204. He explained that the facts that State Park Drive is a local closed loop road with a 25 miles-per-hour speed limit also support the use of the AASHTO low volume road standards. Reilly stated that a 3–foot clear zone satisfies the AASHTO guidelines for low volume roads, given that there is no history of "crashes or run-offs" at the relevant part of State Park Drive. N.T. 197; R.R. 212.

Reilly further opined that Lot Owners' stone wall does not present a safety risk, explaining that the probability of an automobile crash occurring there is "very, very remote." N.T. 191; R.R. 206. In support, he explained that the wall is located at the end of a long bend in the road at a point where cars have already reduced their rate of speed. Reilly noted that there are "a number of [telephone] poles and trees and walls" at other locations on State Park Drive that did not meet the 7 to 10 foot clear zone cited by Fisk. N.T. 192; R.R. 207.

Finally, Lot Owners presented the testimony of David Boruta, an excavating con-

tractor, who testified that he provides snowplowing services to the Association. Boruta testified that the stone wall never impeded adequate snow removal. On cross-examination, Boruta acknowledged that he had only plowed the relevant section of the road six times since the wall was erected.

The trial court granted permanent injunctive relief. It held that Lot Owners' stone wall and planter violated the Association's utility easement and trespassed on the Association's right-of-way, in violation of Covenants I and VII.[4] The trial court ordered the removal of "all boulders and landscaping improvements within the [Association's] easement and/or common areas abutting [Lot Owners'] property" within 30 days. Trial Court Opinion and Order, 8/31/2009, at 5–6. The Court opined that this relief was narrowly drawn to remediate the trespass and interference with the utility easement. Lot Owners now appeal to this Court.

On appeal,[5] Lot Owners contend that the trial court erred in two respects. First, Lot Owners argue that the trial court abused its discretion by disregarding testimony of Lot Owners' witnesses. Second, Lot Owners contend that the Association did not meet its burden to show it was entitled to injunctive relief.

We begin with Lot Owners' contention that the trial court abused its discretion in disregarding their evidence. Specifically, they claim that the trial court ignored the

---

**4.** It held that the Association did not prove a violation of Covenant III.

**5.** In reviewing a grant of a permanent injunction that turns on "whether the lower court properly found that the party seeking the injunction established a clear right to relief as a matter of law," the standard of review for a question of law is *de novo* and the scope of review is plenary. *Penn Square General Corporation v. Board of County Commissioners of*

*the County of Lancaster*, 936 A.2d 158, 167 n. 7 (Pa.Cmwlth.2007) (quoting *Buffalo Township v. Jones*, 571 Pa. 637, 644 n. 4, 813 A.2d 659, 664 n. 4 (2002)). However, this Court is bound by the trial court's findings of fact unless there is not competent evidence in the record to justify the trial court's findings of fact. *Bold Corporation v. County of Lancaster*, 569 Pa. 107, 122, 801 A.2d 469, 477 (2002).

unrebutted testimony of Reilly that the AASHTO standard for low volume roads was the appropriate one to use to calculate the recommended setback for the stone wall. Second, the court disregarded Reilly's unrebutted evidence that other landscaping improvements have been located within the Association's right-of-way without consequence to the other lot owners. Finally, the court disregarded Boruta's testimony that the stone wall does not impede snow removal on State Park Drive. The Association counters that the trial court did not disregard the testimony of Lot Owners' witnesses but, rather, chose to accept the conclusions of the Association's witnesses whenever there was a conflict in testimony.

This Court is bound by the trial court's findings of fact unless those findings are not based on competent evidence in the record. *Bold Corporation v. County of Lancaster*, 569 Pa. 107, 122, 801 A.2d 469, 477 (2002). Likewise, we are bound by the trial court's credibility determinations. *Id.* With these principles in mind we turn to Lot Owners' challenge to the trial court's findings.

Reilly testified that the Association's expert, Fisk, erred in using AASHTO standards that were intended for high volume roads when State Park Drive is a low volume road. The trial court discounted Reilly's testimony for the stated reason that he did not provide evidence of the volume of traffic on State Park Drive. However, this is not accurate.

Reilly did provide evidence on the volume of traffic on State Park Drive. This evidence consisted of his calculations based on the number of structures built along the road; the number of driveways; and whether the homes were primary or recreational. His calculations were based upon the generally accepted industry guidelines of the Institute of Traffic Transportation Engineers. The Association did not present evidence that Reilly miscounted the number of homes and driveways in Big Bass. Nor did it discount or refute Reilly's calculation methodology.

The Association's expert, Fisk, stated that traffic is "normally" measured by counting over a several day period. N.T. 106; R.R. 121. However, he did not testify that there was any flaw in Reilly's calculations or that Reilly had misapplied the guidelines of the Institute of Traffic Transportation Engineers. Further, Fisk himself chose not to undertake the "normal" measurements of traffic to render his opinion, in favor of using the high-volume road standards in the AASHTO guidelines. Fisk offered no authority to support his view that the AASHTO guidelines are, indeed, the default regulations when there is no other specific guidance for a road. Further, he offered no authority, or explanation, to support using the AASHTO high volume road standards, instead of the low volume road standards.

Reilly cannot be faulted for not doing a traffic study when the Association, which has the burden of proof, did not do one. Reilly identified specific standards, *i.e.,* those for a low volume road, and laid the foundation for those standards.

■ The trial court did not resolve these questions. It simply chose to credit Fisk over Reilly for the erroneous reason that Lot Owners did not present evidence that State Park Drive is a low volume road. Lot Owners did provide that evidence by doing a calculation used by highway engineers. It was the Association that failed to provide contrary evidence.

Next, Lot Owners argue that the trial court ignored Reilly's testimony about telephone poles, walls, and trees that have been located within two to three feet of the Association's road with impunity. Two As-

sociation witnesses, Chappa and Fisk, also testified on this issue. Chappa acknowledged that there are other stone walls in the community, but he explained that these walls are not as big, as close to the paved road or at a place where the road bends so sharply. Fisk acknowledged the existence of trees, walls, boulders and telephone poles placed close to the road, but he also testified that they were not "as close" to the road and not next to a place where the road bends. The trial court credited the Association's witnesses, and in this respect, it is beyond our authority to reweigh the testimony or to make other credibility findings. *Bold Corporation,* 569 Pa. at 122, 801 A.2d at 477.

Finally, Lot Owners contend that the trial court disregarded the testimony of Boruta that the stone wall does not impede snow removal on State Park Drive. However, the Association's witness, Scorzelli, testified otherwise. Again, the trial court credited Scorzelli over Boruta, and it is not for the appellate court to reweigh the evidence.

■■■ Next, we consider Lot Owners' second major contention, namely that the Association did not satisfy the standards for a permanent injunction. The party seeking the injunction must establish that (1) the right to relief is clear, (2) there is an urgent necessity to avoid an injury which cannot be compensated for by damages, and (3) greater injury will result in refusing rather than granting the relief requested. *Singleton v. Lavan,* 834 A.2d 672, 674 (Pa.Cmwlth.2003). The case for a mandatory injunction must be made by a very strong showing, one stronger than that required for a restraining-type injunction. *Big Bass I,* 950 A.2d at 1145. Even where the essential prerequisites of a permanent injunction are satisfied, the court must narrowly tailor its remedy to abate the harm. *Id.* at 1144–1145.

In our remand opinion, we observed that the Association had not made the strong showing required for a mandatory injunction. Specifically, the Association had not proved a covenant violation and relief had not been narrowly tailored to abate the harm.[6]

■■■ We begin with the trial court's conclusion that Lot Owners violated two covenants, *i.e.,* Covenants I and VII.[7] Covenant I defines the terms "common property" as meaning "Private Roads and Lakes and Recreational Facilities" in Big Bass. It provides that

> [Lot Owners] never shall be held to have been granted or acquired title to any Common Property or any part of the Common Property whether or not [Lot Owners'] land is physically contiguous with any Common Property.

S.R.R. 31b. In short, Covenant I prohibits lot owners from asserting title to common property.

State Park Drive is located within the Association's 40–foot wide right-of-way, ex-

6. Our remaining concerns were adequately addressed on remand. The record is now clear that the Association's claimed property right in the right-of-way was established by easement, rather than by fee simple title. The trial court specifically found that the stone wall significantly interferes with the use of the right-of-way, *i.e.,* interferes with snow removal, road repair and traffic safety. Finally, the trial court accepted the Association's testimony distinguishing the other encroachments.

7. In their amended complaint, the Association alleged that Lot Owners breached Covenants I, III and VII. The trial court found that Covenant III does not burden Lot Owners, but rather, confers a right upon Lot Owners to use the private roads. Covenant III is not at issue on appeal.

tending from the center of the road 20 feet in each direction. *Big Bass Lake I,* 950 A.2d at 1140 n. 1. Lot Owners did not assert title to that portion of the Association's right-of-way, or easement, where it located the stone wall. The trial court made no findings to that effect. Rather, the trial court found that Lot Owners' wall interfered with the easement, which is irrelevant to Covenant I and does not constitute a violation of Covenant I.

█ Covenant VII establishes a utility easement ten feet into each of the four sides of any lot within Big Bass. Covenant VII does not proscribe landscaping projects in the utility easement, and it does not require lot owners to maintain that part of their lot, which is burdened by the utility easement, in a shovel-ready condition. Indeed, Covenant VII is silent about what the lot owner may, or may not, do to his property falling within the utility easement. Lot owners in Big Bass develop this part of their lot at their peril because when, and if, the Association needs to locate a pole or lay a water line, the Association may destroy the landscaping project. It may cut down trees, upend bushes and move a wall as needed to do the utility work, and the lot owner may not complain. Here, however, there is no evidence that Lot Owners have in any way tried to stop the Association from exercising its rights under the utility easement and, thus, the trial court erred in finding a violation of Covenant VII.

However, the legal theory behind the Association's requested injunction was not solely dependent on the covenant violations. It was also based on the claim that

Lot Owners' wall encroached on the Association's right-of-way easement and significantly interfered with its use of the right-of-way. *Big Bass I,*[8] 950 A.2d at 1147 (citing *Moyerman v. Glanzberg,* 391 Pa. 387, 138 A.2d 681 (1958)).

█ Here, the trial court found that the stone wall's height, mass and proximity to the road constituted a traffic hazard. As such, it significantly interfered with the use of the Association's easement. However, in so finding, the trial court ignored Reilly's testimony that Lot Owners' stone wall does not present a safety risk, explaining that the probability of an automobile crash occurring there is "very, very remote." N.T. 191; R.R. 206. Instead, the trial court relied on Fisk's testimony, which applied the standards for a high-volume road without any evidentiary foundation to support applying those standards to State Park Drive. Thus, Fisk's testimony did not establish a safety hazard.

█ On the second factor, the trial court concluded that the Association has an urgent need to avoid injury that cannot be compensated in damages. The trial court found that the wall interfered with snow removal and road repair. A snow plowing challenge does not constitute an urgent need for injunctive relief or a "significant" interference with an easement.

On the third factor, the trial court concluded that greater injury will result from refusing the injunction than in granting it. The balancing was skewed because the trial court presumed, erroneously, that the stone wall creates a serious hazard to vehi-

---

**8.** The trial court found that the Association established its right to relief for the trespass of Lot Owners' stone wall on the Association's right-of-way. We clearly stated in *Big Bass I* that "the mere existence of an encroachment is not adequate to justify equitable relief. . . . The encroachment must significantly interfere

with the use of the right-of-way." 950 A.2d at 1147. However, the trial court's error does not affect our disposition of this case, since we find that the Association could establish a right to injunctive relief based on the common law restricting interference with easements.

cles traveling on State Park Drive. The basis for the presumption was Fisk's opinion, which was fatally flawed because it was based on high-volume road standards for which there was no evidentiary foundation made.

■ This brings us to the question of whether the trial court has narrowly tailored its relief to address the harm. In *Big Bass I*, we explained that a narrow injunction order might order the wall pushed back or reduced in height. 950 A.2d at 1148 n. 18. However, the trial court ordered Lot Owners to "remove all boulders and landscaping improvements within the [Association's] easement and/or common areas abutting [Lot Owners'] property." Trial Court Opinion and Order, 8/31/2009, at 5–6. The trial court appears to have ordered the removal of the entire wall and planter, even that portion that lies on Lot Owners' titled property that is burdened by the utility easement.[9] The trial court congratulated itself for granting "narrowly drawn" relief but its conclusory statement does not make it so. The Association's evidence, assuming the stone wall presents a hazard, did not show why there was no remedy short of complete demolition of the wall.

The trial court erred and abused its discretion in holding that the Association proved a violation of Covenants I and VII. The facts, as found by the trial court, do not support a violation of either covenant. Lot Owners, like many of their fellow homeowners in Big Bass, have made landscaping improvements on land burdened by the Association's right-of-way easement. Such conduct does not demonstrate an assertion of title, as prohibited by Covenant I. Further, it is of no moment that the Association may have to remove rocks when, and if, it needs to exercise its utility easement to lay a water line or erect a utility pole. Covenant VII protects the Association's right to do what is needed on a homeowner's property, burdened by the utility easement, to secure water and electric service. However, Covenant VII does not limit the landscaping a lot owner may do on that part of his lot burdened by the utility easement.

This leaves the question of whether the Association proved a significant interference with its right-of-way, *i.e.*, State Park Drive. The trial court relied entirely on Fisk, whose opinion was based upon the premise that South Park Drive is a high-volume road. However, Fisk provided no authority or evidence to support this premise and, thus, it lacks a foundation in the record. The trial court erred, therefore, in relying on Fisk's testimony to find, as fact, that Lot Owners' wall "significantly" interfered with the Association's easement. Accordingly, we must also reverse this holding of the trial court.

Because the Association failed to carry its heavy burden of proving a case for a mandatory injunction, we reverse the order of the trial court.

### ORDER

AND NOW, this 22nd day of June, 2011, the Order of the Court of Common Pleas

---

**9.** The trial court opinion states that Acker "conceded that the rock wall encroaches on the roadway right-of-way and also the utility easement." Trial Court Opinion and Order at 5. This is misleading. Acker's report stated that portions of Lot Owners' stone wall planter is located on the part of Lot Owners' lot burdened by the utility easement. R.R. 453. Acker further stated that there is a clear encroachment in the Association's common area, *i.e.*, the right-of-way, but he did not explain what portion of the stone wall is located within the right-of-way. If any portion of the stone wall is located outside the right-of-way, that portion of the stone wall could not be subject to removal because the wall does not violate Covenant VII. Covenant VII authorizes the Association to remove the planter and its plantings if, and when, it needs to do utility work within the easement.

of Wayne County, dated August 31, 2009, in the above-captioned matter is RE-VERSED in accordance with the foregoing opinion.