# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Philadelphia           :
                               :
         v.               :        No. 823 C.D. 2023
                               :        Submitted: August 7, 2023
A Kensington Joint, LLC and  :
Adam Ehrlich,           :
              Appellants   :

BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
                   HONORABLE LORI A. DUMAS, Judge
                   HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY JUDGE FIZZANO CANNON           FILED:  August 9, 2023

A Kensington Joint, LLC (the LLC) and Adam Ehrlich (collectively, Appellants[1]) appeal from the July 26, 2023 Order of the Court of Common Pleas of Philadelphia County (Trial Court), which order granted a preliminary injunction against Appellants and in favor of the City of Philadelphia (City), authorizing the City to enter, inspect, empty, and/or demolish a structure on Appellants' property (Trial Court Order).  The Trial Court Order arose from a complaint filed against Appellants (Complaint) by the City alleging violations of The Philadelphia Code of

---

[1] On August 4, 2023, this Court ordered the merits of this appeal to proceed on an expedited basis and directed the parties to file simultaneous appellate briefs no later than 10:00 a.m. on August 7, 2023.  On the morning of August 7, 2023, counsel for the LLC, who had previously represented both Appellants, withdrew his appearance on behalf of Mr. Ehrlich and filed a brief on behalf of the LLC only.  The Court will continue to refer to Appellants collectively with the understanding that the arguments asserted in Appellants' Brief are those of the LLC only.

General Ordinances (Code)[2] on the property located at 2837 Kensington Avenue in the City of Philadelphia (Property), which includes a three-story mixed-used brick structure (Building). Upon review, we affirm in part and vacate in part the Trial Court Order, and remand for further proceedings on an expedited basis.

## I. Background

The LLC owns the Property, and Mr. Ehrlich is the sole person in control of the LLC.[3] *See* Original Record (O.R.), Item No. 1 (Complaint) ¶¶ 2, 10; Notes of Testimony, 7/26/23 (N.T.) at 62. On July 24, 2023, the City filed the Complaint, together with an Emergency Petition for Order to Vacate and Demolish (Trial Court Petition), in the Trial Court. The Complaint alleges uncured, unappealed violations of the Code pertaining to the Property and sought demolition of the Building as a remedy therefor. *See* Complaint ¶¶ 29-53 & Wherefore Clause.

The Trial Court conducted a hearing on the Trial Court Petition on July 26, 2023. At the hearing, the City presented copies of four notices of violation (Notices of Violation)[4] regarding the Property issued by the City's Department of

---

[2] Phila., Pa., Code §§ 1-101 to 22-1409 (2020).

[3] Mr. Ehrlich also controls business entities other than the LLC that own two vacant lots, one on each side of the Property. *See* Notes of Testimony, 7/26/23 (N.T.) at 63.

[4] The Notices of Violation, setting forth the charged violations and providing dates by which any appeal must be filed and the violations must be corrected, are as follows:

No. CF-2022-092664 – dated September 9, 2022; appeal date of October 9, 2022; correction date of October 13, 2022

No. CF-2023-017143 – dated March 4, 2023; appeal date of March 9, 2023; correction date of April 7, 2023

2

Licenses and Inspections (Department), as well as photographs[5] of the Property and its surroundings taken on July 25, 2023, all of which were admitted into evidence. *See* N.T. at 54-55. The City also presented the testimony of two Department officials about the current condition of the Property. Thomas Rybakowski, a construction compliance supervisor for the Department, in its Contractual Services Unit, testified that on July 25, 2023, he inspected the Property and Building. *See* N.T. at 16. He stated:

> The [P]roperty is unsafe. It was declared unsafe by my unit. It has a vertical fracture along the side wall on the right-hand side. It also, the front wall at the corner is bulged out towards the walkway. There is some fire damage to the interior joists at the tunnel alley area of the [B]uilding. I do not know how far this fire damage has penetrated into the [P]roperty, you can see that there is alligatoring which is basically charring on those structural members, that is one of the structural load points for the [P]roperty. So our fear is that this could be subject to a collapse of the [P]roperty.

*Id.* Mr. Rybakowski also described bulging and deterioration of exterior walls and foundational elements. *See id.* at 19-21. On direct examination, he admitted that the fire damage "indicates significant structural damage *which would need a structural*

---

No. CF-2023-020816 – dated March 16, 2023; appeal date of April 15, 2023; correction date of April 19, 2023

No. CF-2023-017143 – "Final Violation Notice" dated July 11, 2023; referencing March 4, 2023 Notice and stating that "[i]f the time for compliance . . . has passed and was not extended due to the filing of an appeal then the penalties stated in the [March 4, 2023 Notice], including but not limited to inspection fees and fines, will begin to accrue as of the date of this notice."

O.R., Item No. 14 at 1-13.

[5] *See* O.R., Item No. 14 at 14-37.

3

*analysis* to see if the building was able to stand." *Id.* at 21 (emphasis added). Similarly, when asked on cross-examination whether a more robust inspection was needed to make a determination as to the stability of the structure, Mr. Rybakowski admitted that he "would ask for a structural engineer to assess the [P]roperty, but from our assessment there are conditions that would lead to a structural failure." *Id.* at 32. Mr. Rybakowski also agreed that "a structural engineer or some other type of professional [would be needed] to affirmatively state that . . . these defects could lead to an imminent collapse, and . . . whether or not they effected [sic] the structural stability of the building." *Id.* at 36. Mr. Rybakowski admitted there had been no interior inspection of the Building as of the hearing, and that the inspection he conducted on July 25 was a visual inspection from outside the fence surrounding the Property; he did not ask Appellants' permission to enter the Property to conduct a closer inspection. *See id.* at 29-31.

The City also presented the testimony of Tameka Blair, a code enforcement inspector with the Department, who was present at the July 25, 2023 inspection. Ms. Blair also confirmed that there was no interior inspection before the hearing. *See* N.T. at 55. She directly admitted that she was not testifying regarding the Building's structural integrity. *See id.* When asked about structural stability, Ms. Blair declined to offer testimony, explaining: "I stand with my contractual service inspector [(i.e., Mr. Rybakowski)] because he's an expert on that, so whatever he says I go by what he says." *Id.* at 58. Ms. Blair also testified about the reason Department personnel did not enter the Property. Ms. Blair explained that during the March 2023 inspection, personnel were not "able to get inside the [P]roperty due to the activities on the outside, and inside, it was not safe." *Id.* at 41. She observed people on and around the Property using and visibly under the

4

influence of drugs, and believed people in the Building were selling drugs. *See id.* Occupants had posted a notice on the door of the Building prohibiting entry without permission and a person stood at the door allowing people inside. *See id.* at 41-42. Persons allowed entry were later observed leaving with visible drug paraphernalia. *See id.* Tents are set up in the rear yard of the Property. *See id.* at 52. Further, Ms. Blair explained that the Building has numerous illegal connections to electrical lines, but has no legitimate water or electric service. *See id.* at 43, 46-47, 51.

Mr. Ehrlich testified at the hearing on behalf of Appellants. Mr. Ehrlich explained that one of his other business entities purchased the Property for $70,100 in 2020, and transferred the Property to the LLC in December 2022. *See* N.T. at 64-68. Mr. Ehrlich stated that he has permitted certain people to live in the Building, but some persons living in the Building and all those who occupy the adjoining vacant lots or the tent at the rear of the Property are there without his permission. *See id.* at 69-73, 86-87, 127-30. Before any of the Notices of Violation were issued, Mr. Ehrlich initially asked the Philadelphia Police Department (PPD) to remove persons who were living on, and selling and using drugs on, his vacant lots, and he installed a gate to attempt to restrict access. *See id.* at 88-93. Mr. Ehrlich stated that it is difficult to find a contractor willing to work in Kensington. *See id.* at 79, 95. Mr. Ehrlich explained that, in March or April of 2023, he hired a structural engineer to assess the Building violations, paid a deposit of $300 for the work, and was present while the engineer inspected the Building, but that the engineer later refused contact and never delivered the promised report. *See id.* at 95-98.

Mr. Ehrlich also produced evidence of his communications with police and CLIP[6] personnel in attempts to clean up the Property and exclude unauthorized occupants. *See* N.T. at 104-05; 7/26/23 Hearing Exs. D-2 & D-3 (admitted, N.T. at 132). He testified that contractors have performed work including changing the door locks on the Building several times and installing a steel security gate to restrict access to the Property. *See id.* at 106-08. Finally, Mr. Ehrlich stated that he is willing to hire, and able to pay for, a structural engineer to secure a make-safe permit and abate the violations. *See id.* at 118.

The Trial Court found the testimony of the City's two witnesses credible, Trial Court Order ¶ 6, and found the following facts regarding the Property:

7. The [Property] has structural deterioration that has rendered it unsafe; the side wall of the [Building] has loose and missing bricks, the front side wall has a vertical fracture, and the north side wall has missing bricks and fire damaged joists at the tunnel alley.

8. The [Property] has no current approved use but is occupied by unknown transient persons without water and legal electrical and other utility hookup.

9. There are wooden boards on some windows and unknown persons who appear to be monitoring access to the backdoor but otherwise the [B]uilding and curtilage is open to trespass.

10. In inspecting the [Property], Department personnel have observed drug activity and been subject to intimidating behavior by unknown persons loitering in and around the [Property].

11. The lack of utilities and unapproved use of the [Property] has rendered it unfit for human occupation and a danger to Department

---

[6] CLIP is the City's Community Life Improvement Program, which "works . . . to improve the appearance of neighborhoods by landscaping, clearing trash, and removing graffiti." Aman McLeod, *The Port Richmond Industrial Development Enterprise: A Successful Model for Preserving Urban Industry*, 3 DREXEL L. REV. 253, 266 (2010); *accord* City's Br. at 16 n.3.

personnel as well as transient persons attempting to occupy the subject premises.

. . . .

13. The contiguous parcels are occupied by unknown transient persons who are to different degrees encamped there upon.

14. Both the [Property] and the contiguous properties have debris associated with drug activity including discarded syringes and caps.

15. The Department has been unable to do a resinspection [sic] to determine the current state of the interior of the [Building] and determine the degree to which the joists have been degraded, the level of hazmat conditions, and whether other conditions of the [Property] exist stemming from the known unit [sic] and unsafe conditions due to the danger posed to Department personnel by the unknown persons in and around the [Property].

16. The [Property] is in violation of [T]he Philadelphia [Property Maintenance] Code §§ PM-108.1[7] and PM[]-109.1[8] and is unsafe and

---

[7] The Philadelphia Property Maintenance Code, also referred to as Subcode "PM," is located within Title 4 (The Philadelphia Building Construction and Occupancy Code) of the Code. *See* Phila., Pa., Code tit. 4, ch. 4-200.0 (2020). The Trial Court and the Department use the code prefixes "PM-" and "PM15-," which appear to refer to the same subsection of the Code. The Court uses "PM" for consistency.

Section PM-108.1 thereof provides:

**General.** When a structure or equipment is found by the code official to be unsafe, or when a structure is found unfit for human occupancy, or is found unlawful, such structure shall be condemned pursuant to the provisions of this code.

Code § PM-108.1.

[8] Section PM-109.1 of the Property Maintenance Code provides:

**Unfit dwellings:** A structure is unfit for human occupancy whenever the code official finds that such structure is unsafe, unlawful or, because of the degree to which the structure is in disrepair or lacks maintenance, is insanitary, vermin or rat infested, contains filth and contamination, or lacks ventilation, illumination, sanitary or heating facilities or other essential equipment required by this code, or

unfit for human occupancy, due to the deterioration of the structural elements of the [B]uilding (particularly the side walls) and lack of utility service at the [P]roperty; [Appellants] are aware of the conditions of the [Property] and have not taken the necessary steps to bring the [Property] into compliance with the []Code.

17. The [Property] constitute[s] a public nuisance and danger to the public including [Appellants], unknown occupants, first responders, Department personnel, and passersby.

Trial Court Order ¶¶ 7-11, 13-17. The Trial Court then concluded that the City "put forth credible evidence now in the record to support the necessary elements for a preliminary injunction." *Id.* ¶ 18. The Trial Court ordered the following relief:

19. Defendants shall immediately allow representatives from the Department to enter into the premises for the purposes of inspection.

20. If the Defendants fail to allow inspection of the premises, representatives of the Department may gain entry through use of a locksmith and/or law enforcement, with any costs incurred to be charged to the owner of the premises.

21. Thereafter, the Defendants and all occupants shall immediately vacate the subject premises and, as needed to effectuate this order, the contiguous parcels.

22. The City of Philadelphia is hereby authorized to abate the violations, including but not limited to through demolition of the subject premises, which constitute a public nuisance and pose an immediate threat to the health and safety of the occupants of the premises and the public, through demolition.

---

because the location of the structure constitutes a hazard to the occupants of the structure or to the public.

Code § PM-108.1.

8

23. The City shall bill the owner(s) of the premises for the costs of any abatement work performed at the subject premises, including a 21 % administrative fee, in accordance with the [] Code. Such costs shall be entered as a municipal lien against the subject premises upon filing of the City of Philadelphia in accordance with the [] Code.

24. At all times, the Sheriff's Office and/or other Law Enforcement, including the [PPD], shall be permitted to assist the Department in effectuating the terms of this order.

25. The terms of this Order shall be binding on the [D]efendants, agents, lessees, heirs, assigns, successors in interest, and all persons acting in or for the [D]efendant's behalf or occupying the subject premises.

Trial Court Order ¶¶ 19-25.

On July 27, 2022, Appellants filed the Notice of Appeal in this Court challenging the Trial Court Order. On July 31, 2023, Appellants filed a motion in the Trial Court requesting a stay pending their appeal of the Trial Court Order, which the City opposed, and which the Trial Court denied by August 1, 2023 Order. On August 1, 2023, after the Trial Court denied the requested stay pending appeal, Appellants filed an Emergency Application for Stay Pending Appeal (Emergency Application) in this Court and the City filed its Answer in opposition. The Court granted a temporary stay that same day pending oral argument on the Emergency Application. On August 4, 2023, after argument, the Court granted the Emergency Application and directed expedited consideration of the merits of this appeal. *See City of Phila. v. A Kensington Joint, LLC* (Pa. Cmwlth., No. 823 C.D. 2023, filed Aug. 4, 2023) (Fizzano Cannon, J.) (single-judge op.).

9

## II. Discussion

### A. Parties' Arguments

Appellants argue that the Trial Court Order should have applied strict scrutiny to the requested remedy of demolition, and so should be upheld only if that remedy was shown to be necessary for the protection of public health, welfare, and safety. Appellants have not appealed the Notices of Violations, nor do they allege that the violations have been cured. Rather, Appellants challenge only the remedy the Trial Court granted. Citing *King v. Township of Leacock*, 552 A.2d 741, 744 (Pa. Cmwlth. 1989), Appellants argue that the Trial Court erred in authorizing demolition "without considering other less dramatic remedies, without an interior inspection of the [Property] and without the expert report of a structural engineer or other design professional." Appellants' Br. at 9. Appellants argue that Mr. Rybakowski's testimony was the only basis for the Trial Court's findings regarding structural danger, and that this testimony was not substantial evidence because (1) it was based on Mr. Rybakowski's exterior-only inspection of the Building, and (2) Mr. Rybakowski is admittedly not an engineer, was not qualified or offered as an expert, and had no knowledge of the Building's past condition or the history of the defects he observed. *See id.* at 12-16. Appellants also argue that the fire damage of which Mr. Rybakowski testified was not cited in any of the Notices of Violation. *See id.* at 15-16. Finally, they point out that the Trial Court Order did not elaborate on the specific factors necessary for the grant of a preliminary injunction or on how the City had satisfied them. *See id.* at 17-19.

Notably, in response, the City begins by stating that "[because] the [Trial Court] Order . . . is an injunction, the City was required to prove a clear right to relief, irreparable harm if the injunction were not granted, and that the balance of

equities favored an injunction." City's Br. at 20. These are the elements necessary to establish a right to a *permanent* injunction. *See infra* at 14. The Trial Court ordered a preliminary injunction.

The City argues that the strict scrutiny standard in *King*, cited by Appellants, is inapposite because it applies only in cases of *de facto* takings, and not to legitimate uses of police power. City's Br. at 24-26. The City essentially construes Appellants' argument and citation of *King* as assuming that the Trial Court Order is a *de facto* taking of the Property, which the City disputes. *See id.* In support, the City cites judicial decisions upholding legitimate municipal uses of the police power to demolish or otherwise affect property, without effecting a taking. *See id.* at 25 (citing *Keystone Commercial Prop. v. City of Pittsburgh*, 347 A.2d 707, 710 (Pa. 1975); *Balent v. City of Wilkes-Barre*, 669 A.2d 309, 315 (Pa. 1995); *Hill v. City of Bethlehem*, 909 A.2d 439, 445 (Pa. Cmwlth. 2006); *Est. of Blose ex rel. Blose v. Borough of Punxsutawney*, 889 A.2d 653, 659 (Pa. Cmwlth. 2005); *Balent v. City of Wilkes-Barre*, 492 A.2d 1196, 1198 (Pa. Cmwlth. 1985)).

Further, the City argues that the record is sufficient to support the Trial Court's findings and demolition relief. It does so on two apparently inconsistent bases. First, the City claims that, by failing to appeal the Notices of Violation, Appellants conceded that the Building is "unsafe" and "unfit" because that is the nature of the violations at issue, and that this concession establishes a sufficient factual basis, on its own, for demolition. City's Br. at 28-30. The City then acknowledges that it took a "belt and suspenders approach" by not relying on the unchallenged violations alone, but also offering evidence which the Trial Court found credible. *Id.* at 30. Specifically, the City contends that this Court's decisions show that a code enforcement official's testimony can provide substantial evidence

11

to support a demolition order, and testimony by a structural engineer is not required. *Id*. at 32-33 (citing *City of Phila. v. Urban Mkt. Dev. Inc.*, 48 A.3d 520, 523-24 (Pa. Cmwlth. 2012); *City of Erie v. Stelmack*, 780 A.2d 824, 826 (Pa. Cmwlth. 2001); *City of Pittsburgh v. Kronzek*, 280 A.2d 488, 492 (Pa. Cmwlth. 1971)). The City argues that the Code places the burden to procure an engineer's inspection on the property owner, not the City, but that an engineer's inspection is not necessary to support a demolition remedy. *See id*. at 35-36. The City also emphasizes evidence suggesting that Appellants have had notice of the violations since September 9, 2022, and have still failed to cure them, which makes alternative remedies short of demolition impractical. *Id*. at 40-41.

Finally, the City states that based on this substantial evidence and the balancing of the obvious harms by the Trial Court, this Court should affirm the Trial Court Order under the deferential standard of review applicable to preliminary injunctions.

### B. *Nature of Action; Scope and Standard of Review*

Initially, we note that the Trial Court Order does not cite any section of the Code or other ordinance or statutory provision that authorizes the specific remedies the Trial Court granted.[9] In its Complaint, the City cited Sections A-503.1 and A-503.2 of the Code, but neither of these sections directly provides demolition as a remedy. *See* Complaint ¶¶ 78-80. Section A-503.1 of the Code provides that Department officials may "institute the appropriate legal proceedings" to address unremedied violations, including by seeking orders requiring stoppage of work,

---

[9] The Court acknowledges that, given the expedited consideration of this appeal, the Trial Court has not had the opportunity to explain the basis of its decision in an opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

removing work done in violation, and preventing use or occupancy of a noncompliance structure. Code § A-503.1. Section A-503.2 authorizes the Department to perform work to abate the violation at the violator's cost. Code § A-503.2. Neither section provides for demolition. However, the City and the Trial Court in this matter proceeded in equity. *See* Complaint, Civil Cover Sheet (listing action as both "code enforcement" and "equity" action); Trial Court Order at 1 ("order[ing] preliminary injunctive relief"); *id.* ¶ 18 (finding "credible evidence . . . in the record to support the necessary elements for a preliminary injunction"); City's Br. at 23 ("The City moved for an . . . injunction to bring a stop to a dangerous situation and restore the status quo.").

Generally, "[o]ur scope of review in an equity action is limited to a determination of whether the [trial court's] findings of fact are supported by substantial evidence, whether an error of law has been made, or whether the [trial court] abused [its] discretion." *King*, 552 A.2d at 743. However, when reviewing a trial court order granting a preliminary injunction, "appellate courts review . . . for an abuse of discretion." *Marcellus Shale Coal. v. Dep't of Env't Prot.*, 185 A.3d 985, 995 (Pa. 2018). Under this standard of review,

> we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the [trial court].

*Roberts v. Bd. of Dirs. of Sch. Dist.*, 341 A.2d 475, 478 (Pa. 1975). Our Supreme Court "set out the reasons for this highly deferential standard of review almost a hundred years ago":

It is somewhat embarrassing to an appellate court to discuss the reasons for or against a preliminary decree, because generally in such an issue we are not in full possession of the case either as to the law or testimony—hence our almost invariable rule is to simply affirm the decree, or if we reverse it to give only a brief outline of our reasons, reserving further discussion until appeal, should there be one, from final judgment or decree in law or equity.

*Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1000-01 (Pa. 2003) (quoting *Hicks v. Am. Nat. Gas Co.*, 57 A. 55, 55-56 (Pa. 1904)).

While a preliminary injunction preserves the status quo, *Lindeman v. Borough of Meyersdale*, 131 A.3d 145, 151 (Pa. Cmwlth. 2015), a permanent injunction goes "beyond preservation of the status quo" because it "amounts to affirmative relief, designed to permanently remedy the situation, instead of an interim measure ordered to protect the parties until a final hearing." *Soja v. Factoryville Sportsmen's Club*, 522 A.2d 1129, 1132 (Pa. Super. 1987). A permanent injunction order requires the moving party below to establish that "(1) the right to relief is clear; (2) the relief is necessary to prevent an injury which cannot be compensated by damages; and (3) greater injury will occur from refusing the injunction than from granting it." *First Phila. Preparatory Charter Sch. v. Dep't of Educ.*, 179 A.3d 128, 132 n.2 (Pa. Cmwlth. 2018); *see Buffalo Twp. v. Jones*, 813 A.2d 659, 664 n.4 (Pa. 2002) (instructing that because this standard requires the trial court to make a legal determination, our appellate review is *de novo* and for errors of law). Notably, "the test for the issuance of [preliminary injunctions and permanent injunctions] is not the same." *Id.* Rather, permanent injunction claims, unlike preliminary injunction claims, do not require proof of "irreparable harm or immediate relief." *Id.* at 663.

14

## C. Discussion

As this Court has observed:

> We must emphasize that an order of demolition, such as that entered in the instant matter, is a taking pursuant to the police power, without compensation. As such, any order requiring confiscation and destruction of privately-held property must be subject to strict scrutiny and, in no instance, may such action be taken unless it is necessary for the protection of the public health, welfare, and safety.

*King*, 552 A.2d at 744.  An order of demolition is an essentially permanent remedy, and therefore courts follow a series of clear steps before granting it:  1) the proponent of demolition amasses the evidence necessary to support that remedy, and the trial court orders preliminary relief where necessary; and then 2) only after the trial court reviews the evidence and finds it sufficient, it issues a separate demolition order. *See, e.g.*, *Lower Frederick Twp. v. Clemmer*, 543 A.2d 502, 510-11 (Pa. 1988) (describing the trial court "hearing on a permanent injunction wherein [a t]ownship sought, *inter alia*, destruction of [a] structure"); *City of Phila. v. Frempong*, 865 A.2d 314, 315-16 (Pa. Cmwlth. 2005) (first granting preliminary injunction authorizing, but not requiring, owner to demolish structure as one of several options for remediation; and after second hearing, granting permanent injunction); *Borough of Shenandoah v. Cruz* (Pa. Cmwlth., No. 715 C.D. 2016, filed May 22, 2017) (unreported), slip op. at 2 (noting, in equity action for abatement of unsafe buildings, that trial court first issued preliminary injunction after initial hearing, and then after second hearing "ma[de] permanent the preliminary injunction and direct[ed] the demolition of the structures").[10]

---

[10] Pursuant to Commonwealth Court Internal Operating Procedure Section 414(a), 210 Pa. Code § 69.414(a), unreported panel decisions of this Court, issued after January 15, 2008, may be cited for their persuasive value.

In *King*, a municipality filed a complaint before a trial court sitting in equity, seeking to demolish a building in violation of the municipality's nuisance ordinance. *See* 552 A.2d at 742. Similar to this matter, the underlying violations in *King* were entered in the form of a default judgment against the owners, who did not contest them. *See id.* at 743. After hearing, the trial court entered a decree directing the owners to demolish the building. *See id.* On appeal, this Court reviewed the evidence presented below and concluded that it was sufficient to support the trial court's finding that the property was a public nuisance. *See id.* at 744-45. However, as required by the standard of review, the Court also considered whether the trial court's findings adequately supported the *remedy* of demolition. *See id.* We observed that the trial court could have fashioned various remedies short of demolition, including the municipality performing work at the owners' expense, turning off utilities, and "forbid[ding] tenancy." *Id.* at 743-44. We held that "the radical remedy of demolition should be used only when there exists no other practical alternative." *Id.* at 744. We concluded that the findings were insufficient: the owners had performed recent remedial work that the trial court failed to consider, and there was no specific factual finding that the property was structurally unsafe. *See id.* We held that "[d]emolition of a structure . . . is improper if it is structurally safe and poses no danger to the public," and remanded to the trial court for more specific factual findings and reassessment of the remedy. *Id.* at 744-45.

The City argues that we should distinguish *King* because "that case did not involve a true exercise of police powers," whereas this one does. City's Br. at 26. In support, the City cites *Stacey v. City of Hermitage Board of Appeals*, 789 A.2d 772, 776 n.4 (Pa. Cmwlth. 2001). In *Stacey*, property owners received notice of violation, and in an appeal from such notice, a municipal board found that the

16

property was an attractive nuisance, unsafe for human habituation, littered with garbage and uncontrollable weed growth, a fire hazard, and "in danger of collaps[ing]." *See id.* at 773. The municipality sought demolition, and the trial court held a preliminary hearing, granted preliminary relief, and set a permanent injunction hearing. *See id.* at 774. Following the permanent injunction hearing, the trial court entered a decree nisi vacating the temporary injunction, and after denying the owners' exceptions thereto, filed a final decree declining to enjoin demolition. *See id.* This Court affirmed, distinguishing *King* on the basis that violations alleged in *King* were vague and based on aesthetics, and thus did not give sufficient notice to the owners. *See id*. at 776 n.4.

The Court declines to distinguish *King* on the basis that the *Stacey* Court did. It is true that the defect in *King* was the absence of *findings* supporting demolition (because the problems with the property were largely nonstructural). However, *King* also articulated that, even where adequate findings are present, as they are here, those findings must be *supported* by substantial evidence. Put in the City's terms, this means that whether a case involves "a true exercise of the police power" is, in part, an *evidentiary question* that a trial court must answer based on the record before it, not an *a priori* point from which to select the proper legal standard. The question of whether the City's actions here are legitimate uses of the police power depends upon the law and the record, and neither this Court nor the Trial Court can answer that question in a vacuum. Thus, the Court cannot ignore *King* simply because this is not a *de facto* takings matter, as the City suggests. Rather, as *King* explained, even when a demolition is not a *de facto* taking requiring

17

compensation, but is rather *"pursuant to the police power,*[11] without compensation[,]" it must nonetheless be subject to scrutiny for sufficiency of the evidence. 552 A.2d at 744 (emphasis added).

But where, unlike in *King*, a trial court "makes specific findings that the building is unsafe, which [are] supported by substantial evidence,[12] we [will] conclude that the trial court properly granted the City's demolition order." *Stelmack*, 780 A.2d at 828 (affirming demolition order after reviewing testimony below that property at issue was "in an unsafe condition" and "would present a hazard to the fire department and public welfare").

The City concedes that the social and criminal conditions on and around the Property, viewed alone, are not a sufficient basis for the Trial Court's authorization to demolish the Building, but that substantial evidence of the structural defects was necessary to support the Trial Court Order. Therefore, the Court need not consider the Trial Court's findings regarding social and criminal activity as a

---

[11] "[T]he conditions on which exercise of police power is predicated should actually exist or be so likely that action is necessary"; and if such conditions do not exist, the governmental action goes beyond the police power and is invalid, and the action (here, a demolition) becomes a taking requiring just compensation. *Balent v. City of Wilkes-Barre*, 669 A.2d 309, 314 (Pa. 1995). In other words, distinguishing between a *de facto* taking and legitimate police power actions requires a merits analysis of the governmental action, because "only actions taken under a *valid* exercise of police power result in a non-compensable taking." *Id.* (emphasis added); *see also Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 894 (Pa. 2020) (discussing *Balent* and concluding that emergency regulations *lawfully imposed* did not effect compensable a taking).

[12] "[S]ubstantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *W. Penn Allegheny Health Sys., Inc. v. Workers' Comp. Appeal Bd. (Cochenour)*, 251 A.3d 467, 475 (Pa. Cmwlth. 2021). In performing a substantial evidence analysis, the evidence must be viewed in a light most favorable to the party that prevailed below, and it is immaterial if evidence in the record could have supported a different outcome. *See id.* "Mere speculation or conjecture is insufficient to support a factual finding, but where there exists the ability to draw reasonable and logical inferences from evidence that is presented, including testimony, a conclusion so derived will be sufficient." *Id.*

basis for the Trial Court's authorization to demolish the Building. *See* Trial Court Order ¶¶ 8-11, 13-14. Focusing on findings regarding structure alone, however, the Trial Court made sufficient findings to justify demolition, provided those findings are supported in the record. *See* Trial Court Order ¶¶ 7 ("structural deterioration that has rendered [the Building] unsafe") & 16 ("deterioration of the structural elements of the [B]uilding"). *Cf. King* (where such findings were absent). Thus, this Court's review of the remedy of demolition is limited to assessing whether substantial evidence supports those findings. *See King*, 552 A.2d at 744-45*; Stelmack*, 780 A.2d at 828.

The City concedes that its evidentiary[13] proof of sufficient danger to warrant demolition rested on Mr. Rybakowski's testimony, which was based in turn on his exterior visual inspection. The City acknowledges that Mr. Rybakowski is not a structural engineer, but it insists that his testimony as a code inspector is sufficient to support demolition. The City argues an engineer's report "is not needed to determine whether a property is [u]nsafe *in the first place*; instead, that determination is made by the Code Official." City's Br. at 37 (emphasis added). Conceivably, such evidence could be a structural analysis obtained by Appellants,[14] such a report obtained by the City, or some other substantial evidence. Here, the City insists that neither an engineering report, *nor any inspection of the Building's*

---

[13] The Court rejects the City's suggestion that unappealed violations conclusively establish structural danger sufficient to warrant demolition. *See* City's Br. at 28-30. If that were true, no evidence of any kind would be required before a court could order demolition of any property with unappealed violations. This is obviously inconsistent with our decisions holding that judicial review of the evidence is required. *See King*, 552 A.2d at 744-45; *Stelmack*, 780 A.2d at 828.

[14] Relatedly, the City emphasizes that the Code requires Appellants, not the City, to produce a structural engineering report showing that they can abate the structural violations, and it argues that this suggests that no expert engineering testimony is needed to sustain its burden at the evidentiary hearing. *See* Code §§ A-105.1, A-304.1.1; *see also* Ex. C-1 at 5 (Mar. 4, 2023 Notice of Violation, directing Appellants to obtain engineer's report).

*interior at all*, was necessary "because the structural degradation was evident from the exterior of the building." City's Br. at 37. The City concedes, however, that dangerous criminal and social conditions on and around the Property prevented any on-site or interior inspection, and that, had those dangerous conditions not been present, the City would have procured, and introduced in the Trial Court, an interior inspection.[15]

The Court concludes that the evidence in the record is not substantial evidence to support the Trial Court's findings that the Property has structurally deteriorated to the point of being unsafe. The Trial Court relied on Mr. Rybakowski's testimony alone for purposes of its structural findings. First, his testimony was qualified at several points by his admissions that a structural engineering analysis is necessary to truly understand the structural state of the Building. Although he made several statements that the Building was unsafe—or had been deemed unsafe by the Department—his admissions render these statements conclusory and speculative.

Second, Mr. Rybakowski was not offered as an expert witness, despite oblique references to his "expert[ise]" during the hearing. N.T. at 58. And more importantly, Mr. Rybakowski purported to testify directly about the structural stability of the Building, not restricting his testimony to code enforcement, which is his professional field. On that basis, the Court distinguishes *Stelmack*, where we upheld a demolition order against a substantial evidence challenge. *See* 780 A.2d

---

[15] The City noted at argument on the Emergency Application that, had the dangerous nonstructural conditions not been present, it would have performed an interior inspection. The City also discusses in its brief an interior inspection the City conducted on August 1, 2023, after this Court issued its provisional stay order, which inspection the City claims revealed further structural problems. That inspection is outside the record, however, and does not exist for purposes of appellate review. *See B.K. v. Dep't of Pub. Welfare*, 36 A.3d 649, 657 (Pa. Cmwlth. 2012).

824. In *Stelmack*, the city's fire code inspector testified specifically as to the fire code violations in the subject property. He limited his testimony to his experience, stating that the property was "in an unsafe condition *from a fire perspective*[.]" *Id.* at 828 (emphasis added). The Court also contrasts the instant matter with *Borough of Shenandoah v. Cruz* (Pa. Cmwlth., No. 715 C.D. 2016, filed May 22, 2017) (unreported). In *Cruz*, "the structural integrity of the buildings failed and the walls and roof of the buildings collapsed" more than a year *before* the municipality sought demolition. *Id.*, slip op. at 1; *accord id.* at 10-11. The collapse fractured a sewage line and caused raw sewage to collect in the basement for years. *See id.*, slip op. at 1, 10-11. This Court quoted and applied the *King* standard, but found the matter more similar to *Stelmack* and affirmed the demolition remedy because "[t]he record [was] replete with evidence to support" it. *Id.*, slip op. at 12. Notably, even in *Cruz*, where the record established "a hole in the roof the size of a Volkswagen," slip op. at 11, the trial court held a second hearing before making its preliminary injunction permanent and ordering demolition. *See id.*, slip op. at 2.

The Court distinguishes other demolition cases the City cites because they involved records with similarly sufficient evidence. In *Urban Market*, 48 A.3d 520, this Court upheld a trial court's demolition order, but only after the trial court ordered the owner to secure a structural engineering report following a preliminary hearing. *Id.* at 524. At a subsequent hearing, the owner failed to produce the ordered report; without such a report, the trial court credited the testimony of a Department code inspector, who testified that "*there was no interior floor system*, the roof was compromised, and the [p]roperty was in extremely dangerous condition and represented a significant danger to the public." *Id.* at 524 (emphasis added). This

21

conclusion—rendered at a second hearing—appears to have followed an interior inspection.

Similarly, in *Blose*, 89 A.2d 653, we held that the trial court did not commit an error of law in finding that the borough's demolition of the appellant's property was justified. Specifically, we upheld demolition where witnesses testified about the "deterioration of the building," and "[i]n general, . . . that the walls were leaning and bricks were falling from the building," and that these conditions persisted for more than one year. *Id*. at 655. Accordingly, we reasoned that the exterior of the building created "an immediate danger." *Id.* As in *Cruz*, and unlike the instant matter, the dangerous structural conditions of the building were clearly apparent from the outside. *See id*. at 655, 660. As such, witness testimony about the building's external conditions was substantial evidence to support demolition.[16]

Finally, and even if a lay witness's opinion testimony can support demolition when properly limited to the witness's experience as in *Stelmack*, the City acknowledges that, under normal circumstances, it would not rely on an exterior-only visual inspection to show structural defects. Rather, it was only because of the dangerous criminal and social conditions[17] present at the Property and

---

[16] In concluding that the evidence here was not sufficient to support demolition, and in distinguishing cases where lay testimony by municipal officials was ultimately held to be substantial evidence, the Court is not creating an unreasonable or inefficient rule, as the City suggests. *See* City's Br. at 2. Indeed, we need not create a new rule at all to resolve this matter. Nor do we suggest that testimony by a code enforcement official cannot support demolition as a remedy under other circumstances. Rather, we apply our longstanding precedent that substantial evidence is required. The testimony here was based on a cursory, exterior inspection, and unlike in other cases, the structural danger was not obvious. Whether other evidence under other circumstances may suffice is not for us to determine here.

[17] Before the Trial Court, The City identified the dangerous conditions as vagrancy, the sale and use of illegal drugs, and a prior shooting then under investigation by the PPD. *See* Complaint ¶¶ 21, 21, 26; O.R., Item No. 3 (Trial Court Petition) ¶¶ 5 & 21. Mr. Ehrlich has stated

the surrounding area that the City chose to proceed on the exterior inspection alone, rather than risking having its personnel enter the Property. The record contains no evidence that Appellants created the nonstructural social conditions/dangers; and even if they had, such conditions/dangers would not somehow lessen or excuse the City's burden of proof for demolition. To determine otherwise would empower the City to secure a demolition order for any property that it views, from the literal outside, as structurally unsafe. As Appellants point out, the City could have used law enforcement to gain safe access to the Property in order to obtain the evidence required to meet the substantial evidence burden. Although the City offers an explanation for failing to acquire such evidence, the explanation does not alter the record, which lacks the necessary substantial evidence. Likewise, the City's explanation does not excuse its obligation to provide evidence adequate to justify the extreme remedy of demolition. *See King*.

Notably, the Trial Court Order actually authorized multiple, temporally incongruent remedies. First, the Trial Court Order authorized the City "to enter into the [Property] for the purposes of inspection" and ordered Appellants to allow such entry and all occupants to the vacate the Property. Trial Court Order ¶¶ 19-21. The Trial Court Order also authorized the City to contemporaneously "abate the violations, including but not limited to through demolition of the [Building], which constitute[s] a public nuisance and pose[s] an immediate threat to the health and safety of the occupants of the [Property] and the public, through demolition." *Id.* ¶ 22. Therefore, the Trial Court Order calls for an inspection which could not safely occur until the Property was vacated and secured. The results of this inspection are further necessary to determine whether violations can be abated, or whether extant

---

that some persons occupying the Property without permission have "weapons." 7/26/23 Hearing Ex. D-3 (admitted, N.T. at 132).

23

structural deficiencies require demolition of the Building. As discussed *supra*, without the benefit of a sufficient inspection of the Property and Building, the Trial Court could not have directly ordered demolition of the Property, and we observe that, in fact, the Trial Court Order did not directly order the demolition—it merely *authorized* the City to demolish. However, by permitting the inspection and demolition of the Property (which must be based on the sufficiency of the inspection) in the same order, the Trial Court left the determination of the sufficiency of the inspection, and thus ultimately the demolition, to the discretion of the City, without additional Trial Court scrutiny. *See King*, 552 A.2d at 744 (requiring application of strict scrutiny to requests for demolition). Review of the sufficiency of evidence upon which a demolition is based is the function of the Trial Court, however, not the City, and thus the contemporaneous grant of inspection without Trial Court review of the sufficiency of the inspection results prior to demolition was error.[18]

The need for further scrutiny is also reflected in the treatment of demolition as a permanent remedy, which should be granted only after the necessary evidence on the merits is presented, and not on a preliminary basis. *See supra* at 14; *see also Uyseng Ngo v. City of Phila.* (Pa. Cmwlth., No. 2133 C.D. 2007, filed Sept. 11, 2008) (vacating demolition order after trial court improperly converted hearing on preliminary injunction into issuance of permanent injunction authorizing Department to demolish building). All relief the Trial Court granted short of demolition—the right to enter, secure, and clear the Property, and to inspect for structural damage—was appropriate on a preliminary basis to allow the City to

---

[18] We recognize that the City, not the Trial Court, originally devised this inconsistent relief. *See* Complaint, Wherefore Clause (requesting "an order authorizing the Department to conduct an interior inspection to determine if there are additional violations" and also "an order permitting the City to abate the violations in Notice(s) of Violation by demolition"). But it was incumbent upon the Trial Court to apply the required scrutiny.

24

obtain the necessary evidence and to protect the status quo, in light of the reasonable grounds therefor in the record. Under our highly deferential standard of review for preliminary injunctive relief, the Court will affirm those portions of the Trial Court Order. But by ordering demolition, a permanent remedy, without the scrutiny required by *King*, the Trial Court erred.

### III. Conclusion

For the foregoing reasons, the Court concludes that the Trial Court did not err or abuse its discretion in ordering the preliminary relief of entering, inspecting, and vacating the occupants of the Property. However, the Trial Court erred to the extent the Trial Court Order simultaneously allowed demolition as a remedy to abate violations based on the existing record then before it in this matter. Accordingly, the Court affirms in part and vacates in part the Trial Court Order, and remands for further proceedings on an expedited basis.[19]

_____
Christine Fizzano Cannon, Judge

---

[19] The Court notes that nothing in our decision precludes the City from pursuing further remedies, including demolition, based on newly acquired evidence or evidence newly presented to the Trial Court on remand.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Philadelphia         :
                               :

             v.             :         No. 823 C.D. 2023

                                     :

A Kensington Joint, LLC and    :

Adam Ehrlich,              :

             Appellants   :

## **O R D E R**

AND NOW, August 9, 2023, the July 26, 2023 Order (Trial Court Order) of the Court of Common Pleas of Philadelphia County (Trial Court), is hereby AFFIRMED IN PART and VACATED IN PART, and this matter is REMANDED, as follows:

1. Paragraphs 19 and 20, and 23 through 25, of the Trial Court Order are AFFIRMED.

2. Paragraph 21 of the Trial Court Order is VACATED only to the extent it is inconsistent with Paragraph 4 of this Order.

3. Paragraph 22 of the Trial Court Order is VACATED to the extent that it authorizes the City of Philadelphia (City) to demolish the Building (as defined in the accompanying opinion).

4. The matter is REMANDED to the Trial Court for further proceedings on an expedited basis, as follows:

    a. Until final disposition of the City's complaint on remand or until otherwise ordered by the Trial Court, the City shall take all actions necessary to prevent entry onto the property at 2837 Kensington Avenue in the City of Philadelphia (Property) by any persons except 1) counsel of record in this matter, Appellants, City personnel,

and their agents, who shall be authorized to enter the Property solely for the purpose of obtaining any evidence necessary to pursue further relief before the Trial Court in this matter on remand, and 2) law enforcement and emergency services personnel. The parties shall direct any motions regarding access to the Property to the Trial Court, which shall consider such motions on an expedited, emergency basis.

b. City personnel shall enter the Property and conduct an internal inspection of the Building.

c. The City may bill Appellants for any costs incurred for compliance with this Order.

d. The parties may file motions requesting further relief of the Trial Court, including a hearing on permanent injunctive relief, which hearing the Trial Court shall conduct no later than two (2) business days following praecipe for such hearing, and shall issue its decision within two (2) business days after the conclusion of such hearing.

Jurisdiction relinquished.

_____
Christine Fizzano Cannon, Judge